630 So.2d 1038 (1993)
Steven Richard TAYLOR, Appellant,
v.
STATE of Florida, Appellee.
No. 79080.
Supreme Court of Florida.
December 16, 1993.
Rehearing Denied February 10, 1994.
*1039 Nancy A. Daniels, Public Defender and David A. Davis, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and Sara D. Baggett, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Steven Richard Taylor appeals his convictions of first-degree murder, burglary of a dwelling, and sexual battery, and his sentences for those convictions, including a sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed herein, we affirm Taylor's convictions and sentences.
The record reflects that on September 15, 1990, at about 11:30 p.m., the victim, fiftynine-year-old Alice Vest, returned to her mobile home in Jacksonville after spending the evening with a friend. Earlier that evening, the appellant, Steven Richard Taylor, and two friends were out driving and listening to the radio. Around midnight, the driver of the car dropped off Taylor and his friend, who was later to become his accomplice, near the victim's neighborhood.
Sometime in the early morning hours of September 16, a Ford Ranchero was stolen from a residence near the place where Taylor had been dropped off. At about 4:30 a.m., after the vehicle had been stolen, a passing motorist noticed the Ford Ranchero parked in a driveway next door to the mobile home where the victim lived. Later that morning, the Ford Ranchero was found abandoned behind a used car dealership only a few blocks from where Taylor lived at the time.
On the same morning, neighbors discovered the victim's battered body in the bedroom of her mobile home. The medical examiner testified that the victim had been stabbed approximately twenty times, strangled, and sexually assaulted. The medical examiner further testified that most of the stab wounds were made with a knife found at the scene of the crime, while the remaining stab wounds were made with a pair of scissors that were also found at the scene. The medical examiner stated that the victim was alive while she was being stabbed, that she was strangled with an electrical cord, and that the strangulation had occurred after the victim was stabbed.
The medical examiner also testified that the victim's lower jaw had multiple fractures and that she had received several blows to her head. The examiner testified that the fractures of the victim's jaw could have resulted from being struck with a broken bottle found on the bed next to the victim, and that contusions to the victim's head were consistent with being struck by a metal bar and candlestick also found at the scene. Finally, the medical examiner testified that the victim's breasts were bruised, and that the bruises resulted from "impacting, sucking, or squeezing" while she was alive. In the medical examiner's opinion, the victim was alive at most ten minutes from the first stabbing to the strangulation. On cross-examination, the examiner stated that he did not know whether the victim was conscious during all or any part of the attack.
The testimony at trial also revealed that the phone line to the mobile home had been cut, that the home had been burglarized, and that various pieces of jewelry were missing.
In December of 1990, Taylor moved out of the duplex he had been sharing with a friend. In January, 1991, while Taylor's former *1040 roommate was removing a fence behind the duplex, he discovered a small plastic bag buried in the ground near the fence. The bag contained the pieces of jewelry taken from the victim's home during the attack and burglary. The roommate turned the jewelry over to the police and gave a statement. Later that month, Taylor visited the duplex with some friends. The former roommate testified that, at some point during the visit, Taylor went into the backyard and stared at the place where the fence had stood. During the following month, Taylor again returned to the duplex with friends. One of the accompanying friends testified that Taylor went into the backyard and returned a few minutes later with dirty hands. In response to the friend's inquiry as to what he was doing, Taylor allegedly responded that he had left some things there and that they were gone.
On February 14, 1991, the Duval County sheriff's office executed a search warrant on Taylor which authorized the officers to take blood, saliva, and hair samples from Taylor. Taylor was taken to the nurses' station at the county jail so that the samples could be taken, but not before Taylor invoked his right to counsel. Later that day, after the samples were taken, Taylor asked the investigating officer how long it would take to get the results back. Instead of directly responding to the question, the investigating officer asked Taylor why he wanted to know. Taylor responded that he was just wondering when they would be back out to pick him up. Taylor did not have long to wait. Two days later, on February 16, Taylor was arrested, and, on March 3, a grand jury returned a two-count indictment against Taylor for first-degree murder and burglary. The indictment was amended on September 12, 1991, to add a third count for sexual battery.
At trial, the State presented the testimony of Timothy Cowart, who had shared a cell with Taylor in the Duval County jail. Cowart testified that, in a jailhouse conversation with Taylor in early April, Taylor stated that he had been involved in a burglary and that it was a messy job; that the lady surprised him inside the trailer; and that he stabbed her and choked her and then strangled her with a cord to make sure she was dead. Cowart also testified that Taylor said the State could place him, but not his accomplice, at the scene of the crime, and that the State could convict him with the evidence it had. Taylor allegedly asked Cowart to hide a gun and handcuff key in the bathroom at the hospital; Taylor would then feign an illness, get taken to the hospital, and have a chance to escape.
A Florida Department of Law Enforcement lab analyst, who was an expert in serology, testified that semen found on a bed covering and on a vaginal swab taken from the victim could not be tested. However, the analyst testified that semen found in the victim's blouse matched Taylor's DNA profile.
In the guilt phase, Taylor presented only one witness, an agent of the Federal Bureau of Investigation. The agent testified that certain hairs found on the victim's body and clothing matched the pubic hairs of Taylor's accomplice. On cross-examination, the agent conceded that it is possible to commit a sexual battery and not leave any fibers or hair. Taylor then rested his case and the jury found him guilty as charged.
At the penalty phase proceeding, the State rested without presenting any additional evidence. Taylor presented the testimony of five witnesses. First, Taylor called Charles Miles, who lived next door to Taylor during Taylor's adolescence. Miles stated that Taylor frequently played with Miles' son and that Taylor was always very polite and respectful. Miles testified that on one occasion he and Taylor sat in Miles' garage and talked at length about religion. Taylor's next witness was Lloyd King, his uncle. King testified that Taylor had always been a polite person. The third witness, Judy Rogers, was a friend of the family who testified that she thought Taylor had a learning disability. Taylor's next witness was another uncle, Don King, who testified that, during fifth and sixth grades, Taylor experienced difficulty in reading and that his reading comprehension was poor. King also stated that Taylor was a very passive person. As his last witness, Taylor called his adoptive mother, Lenette Taylor, who testified that Taylor had experienced *1041 difficulty concentrating in school and that she had tried unsuccessfully to get him into special education classes. She testified that Taylor's I.Q. had been tested and found to be around 68 to 70, which, according to her, is in the mildly retarded range. On cross-examination, she acknowledged that, in 1979, when he was nine years old, Taylor had tested in a normal intellectual range. The record further reflects that, although defense counsel had Taylor examined by two mental health experts, counsel found it to be in Taylor's best interest not to present the experts' testimony at trial. As an additional mitigating factor, Taylor offered evidence that he was only twenty years old at the time of the murder.
The jury recommended the death sentence by a vote of ten to two. In sentencing Taylor to death, the trial judge found the following aggravating factors: (1) the murder was committed during the course of a burglary and/or sexual battery; (2) the murder was committed for financial gain; and (3) the murder was committed in an especially heinous, atrocious, or cruel manner. As the sole nonstatutory mitigating factor, the trial judge found that Taylor was mildly retarded. The trial judge sentenced Taylor to death for the first-degree murder, to fifteen years' imprisonment for the burglary, and to twenty-seven years' imprisonment for the sexual battery.

Guilt Phase
In his appeal of the guilt phase of his trial, Taylor claims that the trial court erred in: (1) denying Taylor's motion to suppress statements he made to a police officer while he was in custody and after invoking his right to counsel; (2) instructing the jury that it could consider Taylor's efforts to escape from the Duval County jail; (3) admitting evidence that Taylor wanted a fellow inmate to secure a gun and handcuff key and hide them in the hospital bathroom so that he could escape; (4) admitting evidence that the stolen vehicle was seen parked near the victim's mobile home on the morning of the murder and found later that day within several blocks of Taylor's residence; and (5) admitting cumulative photographs of the victim's body.
In his first claim, Taylor argues that the trial judge erred in allowing evidence concerning the statements he made to the investigating officer after the blood samples were taken from Taylor. Taylor argues that he had invoked his right to counsel under the Sixth Amendment of the United States Constitution and his right to remain silent under the Fifth Amendment of the United States Constitution. Taylor argues that, even though he had not been formally arrested, he was not free to leave the jail while the blood and saliva samples were being taken. Furthermore, Taylor asserts that, although he was not being interrogated, the police officer's reply to his question regarding how long it would take to get the test results back was inappropriate and designed to elicit a response.
We reject this argument under the circumstances of this case and find that the trial judge did not err in overruling Taylor's objection. The record establishes that, although Taylor was not free to leave until after the samples were taken, he was not under arrest; that Taylor initiated the conversation; and, more importantly, that Taylor made the statements in question after the samples had been taken and he was free to leave. We find that the constitutional right to counsel under both the United States and Florida Constitutions does not attach under these circumstances. Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); Owen v. State, 596 So.2d 985 (Fla.), cert. denied, ___ U.S. ___, 113 S.Ct. 338, 121 L.Ed.2d 255 (1992). In regard to Taylor's Fifth Amendment claim, we find that Taylor was not being interrogated at the time he made the statements and that Taylor initiated the conversation with the officer. Consequently, there was no Fifth Amendment violation.
In his second claim, Taylor contends that the trial judge erred in reading the standard jury instruction on flight to the jury. Taylor argues that this Court's decision in Fenelon v. State, 594 So.2d 292 (Fla. 1992), abolishing the instruction on flight should be applied retrospectively. In abolishing *1042 the instruction on flight in Fenelon, this Court stated:
We are thus persuaded that the better policy in future cases where evidence of flight has been properly admitted is to reserve comment to counsel, rather than to the court.
Accordingly, we approve the result below although we direct that henceforth the jury instruction on flight shall not be given.

Id. at 295 (emphasis added) (citation omitted). This Court intended that the holding in Fenelon be applied prospectively only, and, since Taylor was tried before our decision in Fenelon was issued, the trial court did not err given the circumstances of this case.
Taylor's next claim also relates to the admission of Cowart's testimony regarding Taylor's desire to escape from the Duval County jail. Taylor argues that the statements he made to Cowart should not have been admissible because they were not evidence of physical preparation for or an actual attempt to escape. We find this argument to be without merit. "Evidence that a suspected person in any manner endeavors to evade a threatened prosecution by any ex post facto indication of a desire to evade prosecution is admissible against the accused where the relevance of such evidence is based on consciousness of guilt inferred from such actions." Sireci v. State, 399 So.2d 964, 968 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982); see also Mackiewicz v. State, 114 So.2d 684 (Fla. 1959), cert. denied, 362 U.S. 965, 80 S.Ct. 883, 4 L.Ed.2d 879 (1960). We find that evidence of the planning of or preparation for an escape is admissible as evidence of an attempt to evade prosecution. Cowart's testimony clearly indicated that Taylor had a specific plan to effect an escape and, thus, was properly admissible.
Next, Taylor argues that the trial judge erred in allowing the State to introduce evidence of the stolen Ford Ranchero even though no evidence or fingerprints actually tied Taylor to the vehicle. Taylor argues that this evidence was not relevant to establish his identity. Furthermore, Taylor argues that identity was not a factor in this case because the State presented an abundance of evidence establishing that Taylor was present when the victim was murdered. We agree with the State that this evidence was relevant and admissible under the total circumstances of this case. Further, any error was harmless in light of the abundance of other evidence presented by the State linking Taylor to the scene of the crime and the murder itself. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
In his last claim regarding the guilt phase of the trial, Taylor asserts that the trial judge erred in allowing the State to introduce numerous photographs depicting the crime scene and the victim. Taylor objected to the introduction of many of the photographs introduced during the testimony of the investigating officer on the grounds that they would be cumulative to the photographs introduced during the testimony of the medical examiner. Taylor contends that, due to their cumulative nature, the probative value of many of the photographs was substantially outweighed by their prejudicial effect. The record reflects that the trial judge determined whether each individual photograph was cumulative and whether it was relevant to the issues being presented. We note that the trial court excluded one photograph and ordered another trimmed in order to avoid several repetitive and gruesome views of the victim. We find no reversible error.

Penalty Phase
Regarding the penalty phase of his trial, Taylor raises the following three claims: (1) whether the trial court erred in finding that the murder was especially heinous, atrocious, or cruel; (2) whether the trial court erred in instructing the jury on the heinous, atrocious, or cruel aggravating factor; and (3) whether it is cruel and unusual punishment under the Eighth Amendment to the United States Constitution and article I, section 17, of the Florida Constitution to execute a mentally retarded person. We find all of Taylor's claims to be without merit.
In his first claim, Taylor argues that the trial court erroneously found the heinous, atrocious, or cruel aggravating factor because *1043 there was no evidence that the victim was conscious or that she endured great pain or mental anguish during the murder. The record reflects that the victim was stabbed at least twenty times with two different weapons. The victim also suffered twenty-one other lacerations, bruises, and wounds, and received several blows to her head and face from blunt objects. The medical examiner testified that the victim was alive while she was stabbed, beaten, and finally strangled. In finding that this aggravating factor was established by the evidence, the trial judge stated:
The victim was first stabbed and, while still alive, strangled with a web belt and electric cord. In other words, she was still alive after she had been stabbed, beaten, cut, and bruised 41 times. She knew she was going to die. What terror, agony, and pain the victim suffered, knowing she was being slowly murdered and that there was no hope of escape, can only be imagined.
We find that the heinous, atrocious, or cruel aggravating factor was clearly supported by the evidence. See, e.g., Perry v. State, 522 So.2d 817 (Fla. 1988); Johnston v. State, 497 So.2d 863 (Fla. 1986); Brown v. State, 473 So.2d 1260 (Fla.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985).
With regard to his second asserted error in the penalty phase, Taylor argues that the "heinous, atrocious, or cruel" standard jury instruction read to the jury is unconstitutionally vague. Taylor initially argued that the instruction given was the same instruction that the United States Supreme Court, in Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), held was unconstitutionally vague. The State correctly pointed out in its brief that the instruction read to the jury in Taylor's case was not the same instruction held to be deficient in Espinosa, but was the new standard jury instruction for this aggravating factor. Although acknowledging this fact in his reply brief, Taylor nevertheless asserts that the current standard jury instruction for this aggravating factor is also unconstitutionally vague. We find that the standard jury instruction for the heinous, atrocious, or cruel aggravating factor given in this case adequately defines the terms "heinous, atrocious, or cruel" and that it is not unconstitutionally vague. See Hall v. State, 614 So.2d 473 (Fla. 1993).
In his last claim, Taylor asserts that he is mentally retarded and that it is unconstitutional for the State to execute such persons. The only evidence of Taylor's alleged mental retardation was presented by his mother, who testified that Taylor's IQ had been tested and that his IQ was 68 to 70. She also stated that Taylor's IQ was tested in 1979, when Taylor was nine years old, and was found to be normal for his age. No other evidence of Taylor's mental condition was presented. The record does indicate, however, that Taylor was examined by two mental health experts and that his trial counsel determined that it would be in Taylor's best interest for neither expert to testify. Consequently, neither the jury, the trial judge, nor this Court has any other empirical data of Taylor's mental condition. In his sentencing order, the trial judge found Taylor was "mildly retarded" and that his mild retardation was a nonstatutory mitigating factor even though Taylor "was a functioning adult; living away from the parental home; engaging in adult occupations and the father of a child." In weighing the mitigating and aggravating circumstances, the trial judge gave "this one mitigating circumstance slight weight." We find that this record supports the trial judge's conclusion and the imposition of the death penalty. Accordingly, we affirm Taylor's convictions and sentences.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES and HARDING, JJ., concur.
KOGAN, J., concurs with an opinion, in which BARKETT, C.J., concurs.
KOGAN, Justice, concurring.
I continue to adhere to the views stated in Hall v. State, 614 So.2d 473, 479-82 (Fla. 1993) (Barkett, C.J., dissenting). However, it is clear that the evidence for mental retardation here rests on speculative and poorly *1044 substantiated testimony, that even if mental retardation exists it is much less serious than that at issue in Hall. Were the evidence of retardation firmer, I might be inclined to a different result.
BARKETT, C.J., concurs.