640 So.2d 186 (1994)
Scott Thomas GRAY, Appellant,
v.
STATE of Florida, Appellee.
No. 91-3457.
District Court of Appeal of Florida, First District.
August 1, 1994.
*188 Robert W. Pope of Pope & Henninger, P.A., St. Petersburg, for appellant.
Robert A. Butterworth, Atty. Gen., and Edward C. Hill, Jr., Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Appellant Scott Thomas Gray appeals from his conviction and sentence for three counts of sexual battery upon a person less than 12 years of age and two counts of lewd, lascivious or indecent act. Gray contends that the trial court erred in (1) denying defendant's motion for an independent psychological examination of the victim, (2) giving flight instructions, (3) restricting defendant's cross-examination of the victim and another witness, (4) allowing two state witnesses to give opinion testimony on a witness' credibility, (5) admitting similar fact testimony, and (6) giving Gray an improper sentence on two counts based on an improper guidelines calculation. We reverse the judgment and sentence based on the court's denial of defendant's motion for independent psychological examination. We will discuss the other issues because they may come up again at appellant's new trial.
Gray was a public school teacher who taught emotionally handicapped elementary school students. The victim of the charged offenses was J.D., a 10-year-old student in Gray's class at the time of the alleged acts. J.D., who was 17 at the time of the trial, testified to three incidents of sexual abuse by Gray. According to J.D., the first incident occurred when Gray had J.D. sit on his lap at the half-moon table in class. Gray poked his finger through a hole in J.D.'s pants and fondled J.D.'s penis. A second incident allegedly occurred when Gray sent the rest of the students outside and took J.D. behind a divider and made the child perform oral sex on him while Gray fondled J.D.'s penis. On the third occasion, Gray kept J.D. after school and they performed oral sex on each other. J.D. also indicated that at another time he went with Gray to Gray's home where the two performed oral sex on each other. J.D. testified that he did not want to do any of these things and that Gray told him that if he ever told anyone, no one would believe him. J.D. waited two years before telling anyone of the abuse. He indicated that he was afraid no one would believe him and was afraid of being embarrassed.
Two other students, R.P. and D.R., also testified. R.P., age 17 at trial, testified that he was a 10-year-old student in Gray's emotionally handicapped class during the same 1984/1985 school year. According to R.P., Gray took him behind a room divider about the first week of school and then almost every day thereafter and fondled his penis and genitals, ostensibly checking for a rash. Although other students were present, they could not see behind the divider. Gray also allegedly fondled R.P.'s genital area through his pants at the half-moon table in the room.
R.P. testified that he told his mother when these incidents occurred, but she did not do anything until stories of other allegations appeared in the newspapers. Although R.P. knew both J.D. and D.R., he indicated they were not close friends and did not discuss the allegations against Gray. On cross, R.P. admitted that he had a lot of emotional problems during this time period and did not like Gray. Upon the state's objection, defendant was not allowed to bring out the fact that R.P.'s brother molested him (penis/mouth contact) a couple of years before the incident with Gray until R.P. was 11 years old.
D.R., also 17 at the time of the trial, testified that Gray abused him when he was a 10-year-old student in Gray's emotionally handicapped class in 1984. He described three incidents of abuse. The first occurred in the classroom when Gray sent the other *189 students out for recess. Gray called D.R. into the bathroom, where he had D.R. put his hand in Gray's pants pocket and feel his penis. The second incident also occurred in the bathroom after the other students were sent out. Gray exposed his penis and asked D.R. to put his mouth on it, but D.R. refused. The third incident occurred while Gray and D.R. were waiting for D.R.'s mother to appear for a conference after school. After D.R.'s mother called in to cancel the appointment due to car trouble, Gray led D.R. to a dark printing room where he made D.R. perform oral sex on him. D.R.'s mother corroborated D.R.'s testimony about the scheduled conference with Gray and indicated that Gray brought D.R. home later that day.
Two months later, D.R. told his cousin about the incidents, and she advised him to tell a teacher. D.R. testified that he told two teachers, and they made him confront Gray with the allegations. Gray denied the allegations; however, rumors spread around the school.
D.R.'s testimony was also corroborated by Deputy Carol Bishop, who interviewed D.R. on October 9, 1984. Deputy Bishop testified that D.R. "was very believable to me because he was very consistent and ... very detailed." Defendant objected to this statement on the basis that "it's a characterization." The court sustained the objection. Defendant made no request for curative instruction, for the statement to be stricken or for a mistrial. Bishop went on to testify that because the incident fell within the city limits, the police department took over the case.
Martin Miller, the Assistant Superintendent for Human Resources with Clay County School Board, received a complaint through the principal about D.R.'s allegations of sexual abuse by Gray. He concluded the allegations were unfounded based on inconsistencies in the report and the answers given by the child.
HRS investigator Pam Buckham testified that she was involved in the initial investigation of D.R.'s allegations in October 1984. HRS classified the report as "indicated." Buckham explained that "[i]n 1984, indicated was the highest classification that could be given to a case and it meant that the Department and myself believed that the abuse had occurred." She stated that HRS later changed the classification of D.R.'s case to "unfounded."
Martha Hix, a school bus driver during the relevant time frame, testified that J.D. and R.P. were passengers on her route. She said both boys were very disruptive children who had to be restrained in a harness when on the bus. She observed Gray strap in the children on occasion and found he treated them no differently than the other students. Both boys, according to Hix, were known to be "not truthful." Hix also noted that R.P. liked to expose himself in front of other children.
Deborah Gotting, another teacher of emotionally handicapped children at the time of the alleged incidents, testified that Gray's classroom was next to hers. Gray had six students in his 1984 self-contained class. Gotting thought Gray mainstreamed students early and that children who should have been with him all day were out of the classroom quite a bit. She also testified that Gray kept his door locked and his blinds closed. Gray told her it was because he sometimes smoked in the room. Gotting indicated that only three or four teachers kept children after school and, generally speaking, teachers did not take students home or on weekend field trips.
Gotting had J.D. in her class for two years prior to the alleged incidents. She said that J.D. had "explosive, unpredictable behavior, was impulsive and easily angered." Although J.D. exhibited a lot of aggression and anger, Ms. Gotting always found him to be honest with her.
Dr. Charles Jones, the head psychologist with the Clay County School Board, testified that he first examined J.D. in 1980 when J.D. was six years old. He found that J.D. was attention and affection seeking. He had self-stimulating dialogue, which the doctor explained meant that he would mutter to himself over and over and be oblivious to others around him. The doctor found that J.D. was of low average intelligence and was very emotional.
*190 Dr. Harry Krop, a psychologist who has evaluated close to 3,000 sex offenders since 1977 and 300 to 400 children who have been sexually abused, testified that after examining the numerous documents (including 19 depositions, police reports, etc.) and testing and interviewing J.D. and D.R., he concluded that the boys exhibited certain psychological and emotional symptoms that are consistent with those often seen in sexually abused children. Krop discussed in great detail 19 child abuse criteria and found that 17 of these criteria applied to J.D. He also discussed the criteria with respect to D.R. briefly. He concluded that "within a reasonable degree of psychological certainty, and particularly compared to all of the other children that I have evaluated, that there are probably more criteria in this case in terms of the consistency with a child who would likely provide a story consistent with an event that he has actually experienced."
In evaluating J.D., Krop found the following criteria consistent with a child who has been sexually abused: (1) delayed disclosure; (2) embarrassed, fearful or uncomfortable composure when discussing the allegations; (3) consistency in disclosures; (4) denial of other suggested sexual abuse beyond scope of allegations; (5) willingness to admit he did not know something; (6) willingness to admit faults (J.D. acknowledged that he has blamed teachers for things in the past and has lied to avoid punishment); (7) serious and somber attitude; (8) logical or coherent story; (9) interruption factor (J.D. remembered janitor walked in during one incident); (10) connectual embedding (J.D. remembered events connected with other events); (11) lack of ulterior motive; (12) adverse consequences (in literature and experience, Krop found no false reports of male/male abuse in victim's age group and explained that at that age it is a great stigma for children to be called fags or gay); and (13) spontaneous correction of mistakes in story. Krop's utilization of the above criteria was facilitated through a lengthy personal interview.
Dr. Krop explained that only about 5 to 10% of all allegations are false. Most of the false allegations arise in (1) custody cases, (2) nursery school cases, and (3) cases involving adolescent girls making allegations against their stepfather in a vindictive manner. He also explained that it is common for sex offenders to choose as victims children who are in some way vulnerable, such as the emotionally handicapped children in this case. It is also common for a pedophile to have more than one victim. Here, although the activities were not identical, the activities were similar and in each case Gray separated the children from other students by keeping them after school or sending the other children out of the room. The pattern of abuse, the manipulation and the type of activity in terms of fondling and so forth are very similar activities that Krop sees in the majority of sex offenders with whom he has worked.
Krop stated that he very seriously weighed the possibility that J.D. might be more likely to make a false allegation because he was emotionally handicapped. He looked at all of the factors and all of the consequences which might occur after making an allegation, and determined that those outweighed any likelihood that J.D. would make a false allegation. Krop acknowledged that he was aware of reports that J.D. had an extreme behavior problem, that he would do things that were unacceptable and would attempt to blame others, and that J.D. was attention-seeking. None of this changed his opinion. Krop had no doubt that J.D. was an emotionally disturbed child. He indicated, however, that it is not true that all emotionally handicapped children are more likely to have problems with memory and fantasy. Children such as J.D. should have no problem distinguishing fantasy from reality as long as they are not psychotic. Krop found J.D. was not psychotic, and his reality testing and memory were good.
Dr. Catherina Coppotelli, a psychologist, was called as the defense expert. Prior to trial, defendant filed a "Motion for Independent Psychological Examination" in which he requested that the court "allow Defendant to have an independent psychological examination conducted on [J.D.]." At the motion hearing, defense counsel suggested that he would be satisfied with even less intrusive measures, i.e. allowing the defense expert to sit in the courtroom during the victim's testimony. *191 The state objected to both the independent psychological examination and the defense's alternative request, and the court denied the motion.
Dr. Coppotelli reviewed all the records, reports and depositions regarding J.D.'s allegations without personally interviewing or examining J.D. She detailed J.D.'s voluminous history of emotional problems and concluded:
And through the last of the records available to me in late 1990, the pattern that continues is one of a child who acts very destructively, continues to do that in part to bring attention and contact to himself and who is in a long-standing pattern of denying his responsibility for the bad results that  consequences that occur, and, in fact, blaming them on other people, as well as accusing a variety of other people of events that are unrelated to his immediate difficulties or the immediate things that were happening around him.
Dr. Coppotelli also found that J.D. had a persistent problem remembering facts and information over a long period of time. His most recent psychological evaluations suggested "deceitfulness, rationalization, and ... inconsistent and potentially untruthful responses." According to Coppotelli, the evidence was inconsistent with "that of a sexual abuse victim."
On cross-examination, the state twice asked Dr. Coppotelli "isn't it imperative that you would have to speak to the child to make that determination?" Noting it was the state's objection that prevented Dr. Coppotelli from interviewing J.D., the trial court sustained defendant's objection to this question and allowed defendant to have the witness explain that she asked to interview J.D. but was not given the opportunity to do so.
The jury found Gray guilty as charged, and the trial judge sentenced him to life imprisonment (with a mandatory 25 years) on the sexual battery counts and to 15 years imprisonment on the other two counts. Two of the mandatory 25 year terms are consecutive; the rest of the sentences are concurrent.

Denial of Personal Psychological Interview
Gray contends that the trial court erred in denying his motion for independent psychological examination of J.D. In his motion, defendant argued that the state would call J.D. as a witness along with medical experts who have evaluated and examined J.D. He asserted that to deny defendant the opportunity to have an independent psychological examination would violate his due process rights because it would deprive him of the opportunity to refute the state's expert testimony which was based on the state's independent examination of J.D. At the motion hearing, defense counsel argued that Gray is entitled to have his expert interview the victim because the state's expert had an independent examination of J.D. Defense counsel also pointed out for the court evidence of J.D.'s prior sexual abuse and evidence that J.D. is an emotionally disturbed child who fantasizes to get attention.
Initially we note a difference between (a) the judge's authority to allow a psychological examination, and (b) the judge's power to compel the victim to submit to the examination. The only issue before us is the judge's authority to grant or deny a motion seeking a psychological examination and not the court's authority to compel the victim to submit to such an examination. The issue is therefore not controlled by cases disapproving a trial court order requiring the state's witness to undergo psychological evaluation. State v. Coe, 521 So.2d 373 (Fla. 2d DCA 1988); State v. LeBlanc, 558 So.2d 507 (Fla. 3d DCA 1990).
The trial court has broad discretion to order or limit discovery. See, Fla.R.Crim.P. 3.220(e) ("Restricting Disclosure. The court on its own initiative or on motion of counsel shall deny or partially restrict disclosures authorized by this rule if it finds there is a substantial risk to any person of physical harm, intimidation, bribery, economic reprisals, or unnecessary annoyance or embarrassment resulting from the disclosure, that outweighs any usefulness of the disclosure to either party"); Fla.R.Crim.P. 3.220(f) ("Additional Discovery. On a showing of materiality, the court may require such other discovery to the parties as justice may require"). *192 See also, Fla.R.Civ.P. 1.200 (court may "limit, schedule, order or expedite discovery" at case management conference); Eyster v. Eyster, 503 So.2d 340 (Fla. 1st DCA 1987), rev. denied 513 So.2d 1061 (Fla. 1987) (trial court possesses broad discretion in granting or refusing discovery motions and in protecting parties against possible abuse of discovery procedures, and only abuse of this discretion will constitute reversible error). However, the trial court's discretion is not unbridled. Grau v. Branham, 626 So.2d 1059 (Fla. 4th DCA 1993); see also Gold, Vann & White, P.A. v. DeBerry, 639 So.2d 47 (Fla. 4th DCA April 27, 1994) (trial court erred in limiting request for discovery under the abuse of discretion standard).
The majority rule which has been followed in Florida is that a court has the discretionary power to order a psychological examination under certain conditions. Camejo v. State, 641 So.2d 109 (Fla. 5th DCA 1994); State v. Coe, supra; Dinkins v. State, 244 So.2d 148 (Fla. 4th DCA 1971); See generally Annotation, Necessity or Permissibility of Mental Examination to Determine Competency or Credibility of Complainant in Sexual Offense Prosecution, 45 A.L.R. 4th 310, 315 (1986); Annotation, Requiring Complaining Witness in Prosecution for Sex Crime to Submit to Psychiatric Examination, 18 A.L.R.3d 1433 (1968). However, even under the majority rule, virtually all agree that a judge lacks the power to actually compel the victim to submit to such an examination. Camejo; Dinkins. Examinations have been historically ordered where, as here, there is strong and compelling evidence of the need for an examination because the victim's credibility is at issue. Camejo; Coe.
Although the courts in Camejo, Coe, and Dinkins found that the defendant failed to demonstrate any compelling or extreme circumstances which could establish the need for a psychological evaluation of the victim, those cases did not involve situations where the state was relying on subjective information it gleaned from a personal interview by its expert. In Camejo, the court noted that the defense had various alternative means to attack the victim's veracity without resorting to the introduction of expert testimony. See also State v. LeBlanc, supra (order compelling a psychological examination by defense doctors of three children regarding whether the children had manifested symptoms of sexual abuse quashed where expert state was using was a court appointed independent examiner and where other tools, such as videotaped interviews, were available to evaluate the children). The Camejo court also used a test articulated in State v. Maday, 179 Wis.2d 346, 507 N.W.2d 365 (Ct.App. 1993), to balance the defendant's constitutional rights and the privacy needs of the victim. The victim's rights in that case far outweighed those of the defendant, whom the court indicated would be little prejudiced by denying the examination.
In the instant case, however, the state's use of an expert who has conducted a four hour interview and examination of the victim and who has relied on that personal interview in reaching his conclusions is strong and compelling reason to allow the defense to conduct its own personal interview. State v. Rhone, 566 So.2d 1367 (Fla. 4th DCA 1990). The failure to allow a defense interview in such circumstances deprives a defendant of "fundamental fairness" by preventing him from "present[ing] a fair defense to the [state's] case." 566 So.2d at 1368. This is particularly true in the instant case in light of prosecution trial tactics after a successful objection to the request for a personal interview of J.D. by the defense's expert. On cross-examination of defendant's expert after the state's own expert testified to his personal interview with J.D., the prosecutor asked the expert twice, "Isn't it imperative that you would have to speak to the child to make that determination?" Appellant had no means to refute the state's expert testimony regarding subjective findings gleaned from the expert's personal interview with the victim.
The instant case is distinguishable from State v. Drab, 546 So.2d 54 (Fla. 4th DCA 1989), rev. denied, 553 So.2d 1164 (Fla. 1989). In Drab, the court found that concern regarding the relative weight that might be given by a jury to one expert who has made a physical exam and one who has not falls far *193 short of the justification for a compelled physical exam. Here, the psychological interview requested is much less intrusive than a physical exam and is necessary to rebut subjective observations; the defendant in Drab took issue only with medical conclusions drawn from objective findings.
The balancing test used in Camejo weighs in favor of granting the motion. In determining whether to grant a psychological examination of a sexual assault victim, the court should consider: (1) the nature of the examination requested and the intrusiveness inherent in that examination; (2) the victim's age; (3) the resulting physical and/or emotional effects of the examination on the victim; (4) the probative value of the examination to the issue before the court; (5) the remoteness in time of the examination to the alleged criminal act; and (6) the evidence already available for the defendant's use. Camejo, 641 So.2d at 111, citing State v. Maday, 507 N.W.2d at 372. Here, appellant requested an interview, not an intrusive examination, by his expert. The victim was no longer of tender years, and there was no testimony that the evaluation will result in any physical or emotional detriment to the victim. The probative value of the examination was heightened by appellant's inability to otherwise refute the state's expert's testimony regarding subjective observations. Given the seriousness of the allegations, the limited scope of appellant's request for an interview rather than a more intrusive examination, the state's use of expert's testimony which was based in part on subjective observations that would be difficult to refute absent an independent interview, and the showing that the victim may have made false allegations due to his emotional instability, the trial court abused its discretion in denying appellant's request for a personal interview of J.D. Our ruling is bottomed upon fundamental fairness notions inherent in due process and not on any independent right to conduct examinations of prosecution witnesses. Certainly we could not endorse a rule allowing a psychological examination whenever the victim's credibility is made an issue. On remand the trial court will have broad latitude to fashion a means to accommodate the defense request.

Flight
Approximately a month after Gray was arrested in November 1986 and bonded out, he failed to appear for a scheduled court date. A capias and arrest warrant were issued. Approximately three years later, the FBI located Gray working at the Pacific Stock Exchange in San Francisco under the name Scott Thomas. When approached by the FBI, Gray said, "You've got me. I am the person you are looking for." Gray voluntarily returned to Florida. The state emphasized the flight evidence in both opening and closing arguments. Over defendant's objection, the trial court instructed the jury that it could infer guilt from defendant's flight.
We affirm the trial court's ruling on the flight instruction based on appellant's failure to preserve this issue for appellate review. At trial, appellant objected on the basis that the jury instruction is overly broad and uses terms such as escape, evade and conceal. On appeal, appellant relies upon Fenelon v. State, 594 So.2d 292, 294 (Fla. 1992), for the proposition that the flight instruction is an improper comment on the evidence. This issue was not raised below and is not properly before this court. See Clark v. State, 363 So.2d 331 (Fla. 1978); Smith v. State, 598 So.2d 1063 (Fla. 1992).
Even if the flight instruction issue had been properly preserved, the most recent Florida Supreme Court decision, Taylor v. State, 630 So.2d 1038 (Fla. 1993), appears to move away from the prior case law[1] holding that Fenelon applies retrospectively to *194 pipeline cases. In Taylor, the court stated: "This Court intended that the holding in Fenelon be applied prospectively only, and, since Taylor was tried before our decision in Fenelon was issued, the trial court did not err given the circumstances of this case." 630 So.2d at 1042. Appellant, like Taylor, was tried before the Fenelon decision was issued. Therefore, the trial court did not err in giving the flight instructions. However, at the subsequent trial, the jury should not be given the instruction. Fenelon; Taylor; Douglass v. State, 634 So.2d 693 (Fla. 1st DCA 1994).

Restricted Cross-Examination
Appellant contends that the trial court erred in restricting defendant's cross-examination of J.D. and R.P. The court restricted defense counsel from cross-examining J.D. regarding a juvenile delinquency proceeding pending against him when he first accused the defendant and regarding similar sexual activity J.D. had with another man after the alleged incidents. The court likewise restricted the cross-examination of R.P. about sexual abuse inflicted upon him by his brother during the relevant time period.
The trial court did not abuse its discretion when it limited the cross-examination of J.D. and R.P. Questions regarding the admissibility of evidence are committed to the sound discretion of the trial judge. Appellant cannot prevail unless he shows that the court abused its discretion. Jent v. State, 408 So.2d 1024 (Fla. 1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982). Appellant has failed to show an abuse of discretion.
The evidence of pending charges against a witness is inadmissible for impeachment purposes unless the charges are pending at the time of the testimony. Breedlove v. State, 580 So.2d 605 (Fla. 1991). Appellant was not precluded from cross-examining J.D. regarding any pending charges. He wanted to question the witness regarding charges that he claimed were pending six years prior to the trial. The broadened cross-examination was therefore not appropriate. Appellant's vague proffer did not present any evidence that there were charges pending at the point in time about which he desired to question the victim. Thus, the proffer was inadequate to show the relevance.
The defense also sought to question the victim about subsequent sexual conduct. Appellant failed, however, to establish that J.D.'s subsequent sexual conduct was relevant. Absent a showing that the subsequent incidents altered the victim's description of appellant's assault or that Dr. Krop's opinion on that abuse factor depended on the subsequent descriptions of sexual abuse, the subsequent incidents of sexual abuse are not relevant and do not show bias. The proffer of subsequent acts lacks a time frame which would assist in establishing relevance. Appellant therefore failed to show that the trial court's exclusion was an abuse of discretion.
Appellant has not shown how the court's ruling with regard to cross-examination of R.P. was an abuse of discretion. This witness was not interviewed by Dr. Krop, thus Krop did not apply the abuse criteria to this witness. Moreover, the witness' testimony was very limited. He testified only that appellant fondled him and engaged in lewd behavior with him. He never testified as to any sexual battery of any kind. His knowledge of sexual matters beyond touchings was therefore not relevant to his testimony.

Opinion on Witness Credibility
Appellant asserts that the trial court erred in admitting testimony of two state witnesses purportedly commenting on D.R.'s credibility. The first witness, Deputy Bishop, stated that D.R. was "very believable," and rebuttal witness HRS investigator Pam Buckham testified that D.R.'s allegation "was classified as indicated," which "was the highest classification that could be given to a case and it meant that the Department [HRS] and myself believed that the abuse had occurred." Although it is well-settled that such comments are improper, Tingle v. State, 536 So.2d 202 (Fla. 1988), Weatherford v. State, 561 So.2d 629 (Fla. 1st DCA 1990), appellant failed to preserve these issues for appeal. Appellant failed to object to Buckham's testimony and waived his objection to Deputy Bishops' statement because the objection was *195 sustained and appellant never asked for a curative instruction, for the statement to be stricken, or for a mistrial. Wilson v. State, 436 So.2d 908 (Fla. 1983).

Similar Fact Evidence
We affirm the trial court's ruling on the similar fact evidence of D.R. and R.P. based on section 90.404(2), Florida Statutes, which provides:
Similar fact evidence of other crimes, wrongs or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
See also Williams v. State, 110 So.2d 654 (Fla. 1959), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). Although appellant contends that the similar fact evidence does not meet the strikingly similar requirement found in Feller v. State, 637 So.2d 911 (Fla. 1994), Thompson v. State, 494 So.2d 203 (Fla. 1986), and Drake v. State, 400 So.2d 1217 (Fla. 1981), cert. denied, 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 832 (1984), and goes only to the issue of propensity, we disagree.
The similar fact evidence in this case meets the strikingly similar requirement and shares with the charged offenses some unique combination of characteristics which sets it apart from other offenses. All three alleged victims were 10-year-old boys at the time of the abuse. They went to the same school, and all were in the emotionally handicap class taught by Gray. All were abused in the same school year, and each boy alleged that some of the abuse occurred at the school. Each boy testified to instances in which Gray separated him from classmates by having him go behind a partition while other students were in the room, sending the other students out of the classroom, or keeping him alone after school. The nature of the abuse was also similar. J.D., R.P. and D.R. alleged that Gray used his position as teacher to isolate them from other students so that Gray could fondle them, have them fondle him or have them perform oral sex on him.
This similar fact evidence was relevant to a material fact as required by section 90.404(2), Florida Statutes, because it established plan, scheme and opportunity by which Gray could have sexually abused students using his position as their teacher and using the physical set up of the classroom.

Improper Guideline Sentence
Appellant asserts that the sentences for lewd assault are improper because the guidelines scoresheet lists the three capital sexual battery convictions as primary offenses. The state concedes that the scoresheets are wrongful based on Anderson v. State, 550 So.2d 488 (Fla. 4th DCA 1989) (capital offenses cannot be scored under the guidelines); Torrres-Arboledo v. State, 524 So.2d 403 (Fla. 1988), cert. denied, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988); Hansborough v. State, 509 So.2d 1081 (Fla. 1987). If appellant is again convicted, his sentence should be imposed in accordance with the above cases.
Accordingly, we REVERSE the judgment and sentence and REMAND for a new trial consistent with this opinion.
JOANOS, KAHN and WEBSTER, JJ., concur.
NOTES
[1] Smith v. State, 598 So.2d 1063 (Fla. 1992) (any decision of state supreme court in nonfinal criminal case must be given retrospective application in every case pending on direct review or not yet final); Lewis v. State, 623 So.2d 1205 (Fla. 4th DCA 1993) (Fenelon applies retroactively to "pipeline" cases pending on direct review or not final at the time of that decision); Phillips v. State, 621 So.2d 566 (Fla. 1st DCA 1993), rev. granted, 634 So.2d 627 (Fla. 1994); Dupree v. State, 615 So.2d 713 (Fla. 1st DCA 1993), rev. denied, 623 So.2d 495 (Fla. 1993); Riles v. State, 613 So.2d 479 (Fla. 1st DCA 1992); Keys v. State, 606 So.2d 669 (Fla. 1st 1992) (followed Fenelon based on Smith.)