2003 SD 87

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**William Robert OSGOOD, II, Defendant and Appellant.**

**No. 22474.**

Supreme Court of South Dakota.

Argued on Feb. 12, 2003.

Decided July 23, 2003.

Lawrence E. Long, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, for plaintiff and appellee.

Gregory J. Erlandson of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendant and appellant.

KONENKAMP, Justice

[¶ 1.] Defendant was found guilty by a jury of criminal pedophilia and sexual contact with a five-year-old child. He later pleaded guilty to being a habitual offender. He was sentenced to the penitentiary. On appeal, defendant contends that the trial court abused its discretion in denying his motion to have his psychological expert interview the child. When the investigation began, an independent forensic examiner interviewed the child and later testified as an expert for the prosecution. The defense wanted a corresponding opportunity for its expert to conduct an interview. If the prosecutor had access to an expert who interviewed the child victim, did the trial court abuse its discretion in refusing to allow the defense expert to conduct an interview? Because there was no evidence that the child was untruthful or delusional

and there was a valid concern that the child could be traumatized by another interview about her experiences, we conclude that the court did not abuse its discretion in denying the request. We affirm.

## Background

[¶ 2.] V.B. was the child victim in this case. Lisa B., V.B.'s mother, met William Robert Osgood, II, the defendant, in August 2000. They became friends and baby-sat each other's children over a period of several months. Osgood babysat V.B. in his home as many as ten to fifteen times from late 2000 until early 2001. At the time, V.B. was five years old and Osgood's son was eight. At some point, differences arose between Osgood and Lisa B. They ended their friendship and their baby-sitting arrangement.

[¶ 3.] A few weeks later, however, on May 27, 2001, Lisa B. and her friends were making plans to go out for the evening. She decided to call Osgood to babysit. After she told V.B., the child responded, "No, you're not calling Bill." Lisa B. recalled later that when she asked why, the child responded, "Well, mom, I didn't want to tell you this because Bill told me not to, but he—he always—it's just that . . . every time I go over there he touches my pee-pee, and one time he let me touch his pee-pee." After Lisa B. and her friends further questioned V.B., Lisa B. contacted the police.

[¶ 4.] On June 5, 2001, V.B. was interviewed by Lora Hawkins, a forensic interviewer with the Child Advocacy Center of the Black Hills.[1] The concept of nationwide children's advocacy centers came about in an effort to prevent the traumatizing effect of repeated examinations of child abuse victims by doctors, social workers, psychologists, and law enforcement

officers. As an ideal, the child would be examined by one doctor and questioned by one trained child interviewer on a single occasion. The Child Advocacy Center of the Black Hills is an independent facility "where children [who] appear to have experienced some sort of trauma . . ." may be questioned "in a neutral, non-leading kind of environment where children might have a better opportunity to be understood." The Rushmore Rotary Club pays the salary for Hawkins. The Center has its office in Rapid City, South Dakota, in the Black Hills Pediatrics medical suite. In addition to Hawkins, the Center has two pediatricians available to conduct physical examinations. Although the Center receives suspected abuse referrals from law enforcement and social service agencies, it is not a part of those agencies.

[¶ 5.] The entire interview was videotaped. During the interview, V.B. said that while she was at Osgood's house, she slept in a bunk bed, with his son in the top bunk and V.B. in the bottom bunk. While the son slept, Osgood came to her bed and reclined beside her. V.B. said that Osgood would touch her "pee-pee" with his fingers. He did this each time she stayed at his home. Moreover, Osgood once had V.B. touch his "wee-wee," when he took it out of his pants. She noticed that it was sticking out, was like a "bone," and "it felt gooey . . . everywhere on his private." In addition, V.B. revealed an incident that occurred in the TV room of Osgood's home, when he put her on his lap and touched her genitals. At a point during the interview, Hawkins left the room to consult with the investigating officer to see if there was any other line of questioning that should be pursued. During the inter-

---

1. Hawkins has a bachelor's degree in psychology and a master's degree in counseling. After nineteen years in Child Protection Services and six years of school and family therapy, she attended additional training to become a forensic interviewer.

view, however, only Hawkins and V.B. were in the room.

[¶ 6.] Both V.B. and her mother were victims of physical abuse at the hands of the mother's boyfriend. One incident occurred two days before V.B.'s disclosure of Osgood's sexual abuse.[2] On that occasion, V.B. may have been aware of the sexual assault of her mother by the boyfriend, an assault similar to the acts perpetrated on V.B. by Osgood. At trial, however, Lisa B. testified that V.B. was in bed asleep when her boyfriend crawled into bed with Lisa B. and "put his hand down [Lisa B.'s] underwear while [she was] sleeping and groped [her] down there." Sometime later, the boyfriend repeatedly beat both Lisa B.'s and V.B.'s heads together until V.B. was knocked unconscious. V.B. also had a prior sexual encounter when she was two or three years old and was playing doctor with her nine-year-old female cousin. The girls licked each other's genitalia. After Lisa B. discovered this, she stressed to V.B. that if she was ever touched in a bad way again she should tell her immediately.

[¶ 7.] Before trial, Osgood moved to have his psychological expert, Dr. Mark Perrenoud, interview V.B.[3] In the motion, defense counsel indicated a concern that Hawkins would be asked at trial to "give an opinion on the issue of V.B.'s credibility based upon her forensic interview." The trial court denied the request, when the child's therapist reported that such an interview would traumatize the child.[4]

[¶ 8.] At trial, V.B., now age six, told the jury that Osgood had "touched her privates" during the times he babysat her. She felt his finger inside her and "it hurt very bad." She testified that she also touched Osgood: "it was something hard and so he took it out and I touched it." "He took it out and made me feel it." She said that Osgood warned her: "Don't tell your mom this or else she'll get mad." On cross-examination, she answered questions on such matters as the abuse she and her mother suffered at the hands of her mother's boyfriend, what she had been told before testifying, and her understanding of the difference between children and adults. Her testimony was responsive to the questions and coherent. Dr. Lori Strong, a board certified pediatrician, testified that she examined V.B. and found no physical evidence of sexual abuse; however, she explained that the absence of any physical signs of sex abuse is not uncommon, especially in light of the type of sexual abuse alleged in this case.

[¶ 9.] After the videotape of the interview between Hawkins and V.B. was played to the jury, Hawkins testified that V.B. was consistent in her allegations of sexual abuse.[5] Hawkins explained that

---

2. Although their testimony was less than certain, two defense witnesses thought they heard Lisa B. say that it was her boyfriend who molested V.B.

3. Dr. Perrenoud is a licensed psychologist with substantial experience working with sexual abuse victims and those accused of committing sexual offenses. He has a bachelor's degree in psychology, a master's degree in counseling, and his doctorate in counseling psychology. He has been a licensed psychologist in South Dakota since 1992.

4. V.B.'s therapist, Linda Holcomb, reported to the court that in her opinion another interview would "retraumatize" the child. The court noted on the record that "nobody disagreed with that was what [Holcomb] said...." Holcomb was not called as a witness. As he concedes in his appellate brief, Osgood did not dispute "the reality that V.B. could be retraumatized by another interview." Rather, he argued that with his expert being experienced in the field sexual abuse the child's trauma would be lessened.

5. Also testifying for the State were Osgood's son; Shilo Paris, Lisa B.'s friend who was

she was not privy to the specifics of other accounts V.B. had given. She used the term "consistent" to mean internal consistency in V.B.'s account to her, including the location, the perpetrator, and the "physical description" of what she experienced. Hawkins also said that the child did not exhibit signs of being coached or having her statement "rehearsed or taught." She gave no explicit opinion on whether V.B. was telling the truth. Hawkins was never asked in the trial and never testified whether V.B. exhibited traits and characteristics consistent with those found in sexually abused children. *See State v. Bachman*, 446 N.W.2d 271 (S.D.1989) (such questions permissible).

[¶ 10.] Dr. Perrenoud testified for the defense. In preparation, he reviewed the discovery materials provided by the State, including law enforcement reports; the videotape of the interview with Hawkins; the transcript of a motions hearing in which Hawkins, Dr. Strong, and Lisa B. testified; counseling notes; and arrest reports from Lisa B.'s domestic violence incident. He also observed V.B. testify in the trial and conferred with defense counsel before cross-examination. Dr. Perrenoud identified behaviors that victims of both physical and sexual abuse may exhibit. As to whether V.B. exhibited characteristics consistent with those found in sexually abused children, Dr. Perrenoud opined that other factors, such as the child's physical abuse, self-stimulation, prior sexual abuse, multiple caretakers, and her mother's casual attitude about her excessive drinking, could account for V.B.'s behaviors.

[¶ 11.] In closing argument, defense counsel asserted that V.B. "made a story

up." Thus, the jurors were left to decide whether to believe or disbelieve the child. The jury found Osgood guilty of criminal pedophilia and sexual contact with a child. After he pleaded guilty to being a habitual offender, he was sentenced to life in prison for criminal pedophilia and a concurrent twenty-five years in prison for sexual contact with a child. Osgood appeals on the sole ground that the trial court abused its discretion in denying his motion to have the defense psychologist interview the child victim.

## Analysis and Decision

[¶ 12.] As the only eyewitness, V.B. was pivotal to obtaining Osgood's conviction. Her testimony was largely uncorroborated. Her credibility was crucial. Hawkins bolstered V.B.'s credibility to the extent that she testified that V.B. did not appear to have been coached, rehearsed, or taught. Osgood contends, therefore, that his expert should have had the same access to this critical witness. To deny him the same opportunity, he argues, was fundamentally unfair because it deprived him of the right to refute the State's expert. Although Dr. Perrenoud was able to view the videotaped interview, Osgood believes that it was not the same as being able to conduct a personal interview.

[¶ 13.] We dealt with a related question in *State v. Cates*, 2001 SD 99, ¶ 15, 632 N.W.2d 28, 35. There, the defense moved for a psychiatric exam of the child sex abuse victim. We found no abuse of discretion in the denial of the request. To obtain such an examination of the victim, the defendant must make a substantial showing of need and justification. *Id.* at ¶ 15, 632 N.W.2d at 35. An unsupport-

present during V.B.'s initial disclosure; Lisa B.; and investigating officer Robert Lehrkamp. Testifying for the defense were Dr. Mark Perrenoud; Orville Osgood, the defen-

dant's brother; Russ Simkins; John Erickson; Myla and Misty Ebright; Shilo Paris; Tina Warren; and Tanya Elcock.

ed assertion that the proposed interview would be useful to the defense is plainly inadequate. We have long held that the purpose of a psychological or psychiatric examination of the victim in most cases involving sex offenses is to detect any thought disorders or distortion of perceptions that might affect the credibility of the complaining witness. *Id.*

[¶ 14.] As with adverse psychiatric exams, we think it wholly inadequate merely to assert that one has the right to duplicate a forensic interview without demonstrating a justification for this measure. Therefore, before a court should order a defense psychological interview of a child complainant of alleged sex abuse, there must be some indication to justify it, such as evidence raising a concern about the victim's veracity. *See State v. LeBlanc,* 558 So.2d 507, 509 (Fla.Ct.App.3d Dist. 1990). A defendant would have to show, for instance, that due to mental or emotional incapacity, a victim's allegations may be spurious. *Cf. Anderson v. State,* 749 P.2d 369 (Alaska App.1988) (substantial concern about competency to testify). A case in point is *State v. Stacy,* 179 W.Va. 686, 371 S.E.2d 614 (W.Va.1988), where the trial court erred in denying a defense motion for an independent psychiatric examination of a five-year-old complainant, when the child's ability to recall events and to testify truthfully about them was in serious question and when she was unresponsive or answered incoherently on cross-examination.

[¶ 15.] In oral argument, Osgood suggested that the ruling in *Gray v. State,* 640 So.2d 186 (Fla.Ct.App.1st Dist. 1994) lent guidance to our decision. There, in the case of a teacher charged with molesting his pupil, the prosecution's expert psychol-ogist concluded that the victim "exhibited certain psychological and emotional symptoms that are consistent with those often seen in sexually abused children." *Id.* at 190. However, there was testimony that the child, an emotionally handicapped elementary school student, was known to be "not truthful" and liked to expose himself to other children. *Id.* at 189. The defense sought an adverse psychological examination. At the motion hearing, defense counsel offered a less intrusive measure than an adverse exam, i.e. allowing the defense psychologist to sit in the courtroom during the child victim's testimony. *Id.* at 190–91. But the prosecutor objected to that as well, and the court denied the motion. During the trial, the prosecutor, in cross-examining the defense expert, unfairly took advantage of the court's denial of a defense interview by asking the defendant's expert, "isn't it imperative that you would have to speak to the child to make that determination?"[6] *Id.* at 191. A Florida appellate court found that it was an abuse of discretion to refuse the defense request for an independent psychological examination. The court ruled that the prosecutor's use of subjective information it gleaned from its expert's personal interview is a compelling reason to allow the defense its own personal interview. Considering all these circumstances, the court held that the failure to allow the interview deprived the defendant of fundamental fairness by precluding him from presenting a fair defense to the prosecution's case. *Id.* at 192–93.

[¶ 16.] Several facts distinguish that case from ours. There, according to the defense expert, the child's most recent psychological evaluation suggested "deceitfulness, rationalization, and ... inconsis-

---

**6.** Osgood contends that the State used a similar tactic here, but the record is equivocal on that point.

tent and potentially untruthful responses." *Id.* at 191. That opinion was corroborated by witness testimony about the child's lying. Here, Osgood points to no evidence, expert or otherwise, suggesting that V.B. was deceitful, untruthful, or delusional. From our review of the Hawkins videotape interview, the child appeared to give a detailed and coherent rendition of events. In *Gray*, the defense expert believed that the child's evidence was inconsistent with "that of a sexual abuse victim." *Id.* Here, on the other hand, after viewing V.B.'s video interview and witnessing her testimony in court, Dr. Perrenoud did not say that her factual situation was inconsistent with having been sexually abused. He would only say that her other "life stressors" complicated the picture and that these other elements could be another explanation for her behaviors.

[¶ 17.] In *Gray*, there was no evidence offered that the victim, seventeen at the time of his testimony, would suffer "emotional detriment" from a psychological examination. *Id.* at 193. Here, the trial court denied Osgood's motion after considering the opinion of V.B.'s therapist that a further interview would traumatize V.B.[7] At the time, V.B. was six years old. Lastly, unlike the prosecution's expert in *Gray*, Hawkins was not an expert hired by the State. She was an independent forensic examiner. True, she worked closely with law enforcement, but she was autonomous, and, except for the interview, was not involved with investigating this offense. In judging whether the defendant has a reciprocal right to an expert, courts have made a distinction between experts hired by the prosecution and independent experts. *See LeBlanc*, 558 So.2d 507 (order compelling

a psychological examination by defense doctors of three children regarding whether the children had manifested symptoms of sexual abuse quashed where expert prosecution was using was a court appointed independent examiner).

[¶ 18.] Trauma to a child victim is certainly a valid consideration in determining whether to grant an adverse interview. "Making court-ordered adversarial examinations routinely available would raise a barrier to the prosecution of this kind of crime by maximizing the trauma that its victims must endure." *United States v. Rouse*, 111 F.3d 561, 567 (8thCir.1997). Courts should give due consideration to the traumatic effect adversarial interviews may cause.

[¶ 19.] On the other hand, the need to protect the victim cannot override a defendant's rights. Trial courts bear the duty to strike a balance between the defendant's right to a fair trial and the State's interest in the welfare of the child victim. Therefore, trial courts should carefully weigh requests for adverse psychological interviews of child sex abuse victims. Among the relevant considerations for assessing a claimed substantial need, courts may consider the victim's age; the nature of the examination requested and whether it might further traumatize the victim; whether the prosecution employed a similar expert; whether the evidence already available to the defendant suffices for the purpose sought in the examination; whether there is a reasonable basis for believing that the child's mental or emotional state may have affected the child's veracity; whether evidence of the

---

7. For the benefit of future cases, it is important to note here that there is a difference between a judge's authority to order a psychological examination and a judge's power to compel a witness to submit to an exam. The only question here is the circuit court's authority in granting or denying a motion for a psychological interview, not the authority to compel the victim to submit to such an examination.

crime has little or no corroboration beyond the testimony of the victim; whether there is other evidence available for the defendant's use; and whether the child will testify live at trial, so the jury will be able to assess credibility firsthand. *Gray,* 640 So.2d at 193; *Chapman v. State,* 117 Nev. 1, 16 P.3d 432, 434 (2001); *Koerschner v. State,* 116 Nev. 1111, 13 P.3d 451, 455 (2000); *State v. Braun,* 787 P.2d 1336, 1343 (Utah Ct.App.1990); *State v. Delaney,* 187 W.Va. 212, 417 S.E.2d 903, 907 (1992). *See generally* Annotation, *Necessity or Permissibility of Mental Examination to Determine Competency or Credibility of Complainant in Sexual Offense Prosecution,* 45 A.L.R.4th 310 (1986); Annotation, *Requiring Complaining Witness in Prosecution for Sex Crime to Submit to Psychiatric Examination,* 18 A.L.R.3d 1433 (1968).

[¶ 20.] We review for abuse of discretion a circuit court's denial of a motion to compel the examination of a child sex abuse victim. *Cates,* 2001 SD 99 at ¶ 14, 632 N.W.2d at 35. Even if we find an abuse of discretion, we will affirm unless the defendant's substantial rights were violated. SDCL 23A–44–14 (Rule 52(a)). Considering the entire record, we conclude that the trial court did not abuse its discretion in refusing to permit Dr. Perrenoud to interview V.B. Osgood failed to make a substantial showing of need. The ruling that the child would suffer further trauma if the psychological interview had been ordered stands unchallenged. Nevertheless, defense counsel and Dr. Perrenoud had access to the reports and V.B.'s videotaped interview. The child testified at the trial and the jurors had the opportunity to observe her firsthand and determine her credibility for themselves. Dr. Perrenoud sat in the courtroom during the child's testimony. Defense counsel then had the opportunity to confer with him and formulate appropriate questions for cross-examining the child. With his observations of the child both on the videotape and in the courtroom, Dr. Perrenoud was able to testify concerning other factors that could have contributed to V.B.'s allegations. Therefore, Osgood had other means available in an attempt to discredit V.B.'s testimony. *See also LeBlanc,* 558 So.2d 507 (other tools, such as video-taped interviews, were available to defense experts to evaluate the children).

[¶ 21.] Lastly, there is little to suggest that had Dr. Perrenoud been able to interview V.B. personally that he would have uncovered information that could have changed the result of this trial. Thus, even if the trial court abused its discretion in refusing the interview, the ruling was not prejudicial. SDCL 23A–44–14 (Rule 52(a)).

[¶ 22.] Affirmed.

[¶ 23.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.