PER CURIAM.
Anthony Spann appeals the denial of his successive motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.851. In his motion, Spann challenged his convictions and sentences, including a judgment of conviction of first-degree murder and a sentence of death, based on the recantation testimony of accomplice Lenard Philmore, which Spann submitted to the trial court as newly discovered evidence. Because this case concerns postconviction relief from a capital conviction for which a sentence of death was imposed, we have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the denial of postconviction relief.
I. STATEMENT OF THE CASE
Spann’s convictions and sentences stem from his participation in a November 1997 crime spree that included a pawn shop robbery, bank robbery, carjacking, and murder. Following a jury trial in November 2000, Spann was convicted of conspiracy to commit robbery with a deadly weapon, for which he received a sentence of fifteen years in prison; carjacking with a deadly weapon, for which he received life imprisonment; kidnapping, for which he received life imprisonment; robbery with a deadly weapon, for which he received life imprisonment; and grand theft, for which he received five years. For the death of the murder victim, Kazue Perron, Spann *815 was convicted of first-degree murder and sentenced to death. This Court affirmed Spann’s convictions and sentences on direct appeal. See Spann v. State, 857 So.2d 845 (Fla.2003).[1]
At trial, the State’s primary witness against Spann was his accomplice, Lenard Philmore.[2] On or about September 1, 2008, Spann received an affidavit from Philmore which stated in part, “Anthony Spann didn’t have anything to do with the crime for which we are on death row for.” Spann subsequently filed a petition for writ of habeas corpus in the United States District Court for the Southern District of Florida. Spann raised, several claims in his petition, including an “actual innocence” claim based on Philmore’s recantation. See Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). In response to the State’s argument that the claim was unexhausted, Spann requested that his federal petition be held in abeyance. The federal district court denied the request, explaining that “[u]pon the filing of a successive motion for post-conviction relief in state court, [Spann] may refile his request to stay the instant Petition.”
On May 4, 2009, Spann filed the instant successive rule 3.851 motion in which he argued, as his sole claim, that he is entitled to a new trial based on Philmore’s recantation. On September 1, 2009, the trial court held an evidentiary hearing on Spann’s successive motion. Spann’s sole witness at the hearing was Lenard Phil-more. In his postconviction testimony, Philmore denied that Spann had any involvement in the pawn shop robbery, the bank robbery, or the carjacking and murder of Kazue Perron. Philmore explained that he had “changed [his] life” and that he had “decided it was time to tell the truth.” Following the evidentiary hearing, the trial court issued an order denying Spann’s motion, finding Philmore’s recantation “not credible, untruthful, and exceedingly unreliable.” Spann now appeals the trial court’s denial of relief.
II. STANDARD OF REVIEW
This Court has previously held that for a conviction to be set aside based on a claim of newly discovered evidence, the defendant must meet two requirements. ■ First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So.2d 512, 521 (Fla.1998) (“Jones II”). Newly discovered evidence satisfies the second prong of the Jones II test if it “weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.” Id. at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996)). In determining whether the newly discovered evidence compels a new trial, the trial court must “consider all newly discovered evidence which would be admissible,” and must “evaluate the weight of both the new *816 ly discovered evidence and the evidence which was introduced at the trial.” Jones v. State, 591 So.2d 911, 916 (Fla.1991) {“Jones I”).
While this Court has recognized that the recantation of a witness may under some circumstances qualify as newly discovered evidence, see Wyatt v. State, 71 So.3d 86, 100 (Fla.2011), we have also observed that recantations are, as a general matter, “exceedingly unreliable.” Bell v. State, 90 So.2d 704, 705 (Fla.1956). Our decision in Armstrong v. State, 642 So.2d 730 (Fla.1994), sets forth the principles to be followed when the testimony of a recanting witness is submitted as newly discovered evidence:
Recantation by a witness called on behalf of the prosecution does not necessarily entitle a defendant to a new trial. In determining whether a new trial is warranted due to recantation of a witness’s testimony, a trial judge is to examine all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. “Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury.” Only when it appears that, on a new trial, the witness’s testimony will change to such an extent as to render probable a different verdict will a new trial be granted.
Id. at 735 (citations omitted) (quoting Bell, 90 So.2d at 705); see also Lambrix v. State, 39 So.3d 260, 272 (Fla.2010); Archer v. State, 934 So.2d 1187, 1196 (Fla.2006). In accordance with Armstrong, “recanted testimony that is alleged to constitute newly discovered evidence will mandate a new trial only if (1) the court is satisfied that the recantation is true, and (2) the recanted testimony would probably render a different outcome in the proceeding.” Davis v. State, 26 So.3d 519, 526 (Fla.2009).
Moreover, this Court has explained that when, as in this case, “a newly discovered evidence claim relies on an admission of perjury, the critical issue of credibility necessarily arises.” Archer, 934 So.2d at 1196. Unlike this Court, “the trial judge is there and has a superior vantage point to see and hear the witnesses presenting the conflicting testimony. The cold record on appeal does not give appellate judges that type of perspective.” State v. Spaziano, 692 So.2d 174, 178 (Fla.1997); see also Nixon v. State, 2 So.3d 137, 141 (Fla.2009) (noting that appellate courts do not “reweigh the evidence or second-guess the circuit court’s findings as to the credibility of witnesses” (quoting Brown v. State, 959 So.2d 146, 149 (Fla. 2007))). For that reason, “[t]his Court will not substitute its judgment for that of the trial court on issues of credibility.” Johnson v. State, 769 So.2d 990, 1000 (Fla. 2000). “When reviewing a trial court’s determination relating to the credibility of a recantation, this Court is ‘highly deferential’ to the trial court and will affirm the lower court’s determination so long as it is supported by competent, substantial evidence.” Lambrix, 39 So.3d at 272 (quoting Heath v. State, 3 So.3d 1017, 1024 (Fla.2009)).
III. FACTS
At trial, Philmore described the circumstances surrounding the pawnshop robbery, the carjacking and murder of Per-ron, and the bank robbery. While the State presented numerous witnesses in support of Philmore’s account, only Phil-more conclusively identified Spann as his coperpetrator in the offenses. In his testimony at the postconviction evidentiary hearing, however, Philmore recanted those *817 portions of his trial testimony that included Spann as his coperpetrator. Instead, Philmore now maintains that he was aided in the crime spree by an individual whom he identified as Daryl Brooks. As discussed above, the trial court rejected Phil-more’s recantation as untruthful. In order to determine whether the trial court’s finding is supported by competent and substantial evidence, it is first necessary to review the account of the crime spree that was provided by Philmore at trial, the additional evidence at trial that supported Philmore’s account,[3] and Philmore’s revised account as well as other testimony submitted at the evidentiary hearing on Spann’s successive postconviction motion.
1. Philmore’s Trial Testimony
Philmore testified at trial that on the morning of November 13, 1997, he was sleeping at the home of Spann’s cousin Sophia Hutchins in Riviera Beach when he was awakened by Spann. Philmore explained that at that time, he and Spann were both in need of money so they could leave Florida.[4] Spann told Philmore that he had located a pawn shop they could rob. Spann’s plan was to use his own car, a blue Subaru, as a getaway vehicle. Philmore testified that the Subaru was a stick-shift, which he did not know how to drive, so it was agreed that he and Hutchins would rob the pawn shop while Spann would act as the getaway driver.
The robbery of the pawn shop was carried out as planned. Philmore testified that immediately after the robbery, he exited the pawn shop and returned to Spann’s Subaru while Hutchins ran in another direction. Spann and Philmore then drove back to Hutchins’ house. Spann later picked up Hutchins at another location and brought her back to the house, where they reviewed the items taken in the robbery. While Philmore and Hutch-ins succeeded in taking some jewelry and four guns from the pawn shop, they obtained little cash. Philmore testified that Spann was upset because the proceeds of the robbery were not sufficient. Later that day, Philmore sold the jewelry and one of the guns. As for the remaining guns, Philmore, Spann, and Hutchins each kept one.
That evening, Spann and Philmore picked up their girlfriends, Keyontra “Kiki” Cooper and Latoya Stevenson, and drove to a motel, where they spent the night. At one point the women left the room, leaving Spann and Philmore alone. According to Philmore, Spann then raised the idea of robbing a bank. Philmore agreed and the two decided that they would again use the Subaru as a getaway vehicle. Since Spann and Philmore assumed the police would be looking for the Subaru, they decided that they would have to steal another car which they would use to leave the state. Philmore testified that they intended to drive to New York after the robbery.
The next morning, the group left the motel. Spann and Philmore dropped Cooper and Stevenson off at their respective homes at approximately noon. It was agreed that Spann and Philmore would pick up the women later that day to drive *818 to New York. When they were alone, Spann and Philmore again discussed their plans concerning the robbery. According to Philmore, Spann said they should find a person getting out of a vehicle and take the car at gunpoint. Spann told Philmore that they would have to kill the driver of the vehicle so they could not be identified. Spann and Philmore first went to a shopping mall to search for a victim. They followed one potential victim to another mall, but concluded the person was not a suitable target. Spann then suggested that they go to a neighborhood in West Palm Beach where he believed they could find nice cars. Once there, they spotted a gold Lexus and followed it into a driveway. Spann and Philmore got out of the Subaru and asked the driver, Kazue Perron, if they could use her phone. Perron replied that she did not have a phone and started to leave. Philmore drew his gun and directed her to get back in the car. Phil-more sat in the driver’s seat of Perron’s Lexus, while Perron sat in the front passenger’s seat. Philmore then drove the Lexus away from West Palm Beach while Spann followed in the Subaru.
After passing through Indiantown, Phil-more pulled over to the side of the road. Spann pulled up behind Philmore, got out of his car, and came over to the Lexus. Philmore testified that Spann directed him to take the Lexus down a road they had recently passed. Philmore did so and Spann again followed in the Subaru. When they reached the end of the road, both men got out of their cars. Spann nodded his head toward Philmore, which Philmore understood to mean that he should kill Perron. Philmore told Perron to go to the side of a canal that was next to the road. Philmore testified that Perron instead began to move toward him, at which time he shot her in the forehead. Philmore picked up Perron’s body and threw it into the canal. In the process, Philmore got blood on his shirt.
Philmore and Spann drove the cars to a location near the bank they planned to rob, where they hid the Lexus. Before the robbery, Philmore threw away his bloody shirt and put on Spann’s shirt. Spann then drove Philmore to the bank in the Subaru. Philmore testified that he walked into the bank, saw a woman behind the counter holding some money, grabbed the cash, and ran back to the Subaru. Phil-more gave $500, approximately half the loot, to Spann. The two then drove back to the Lexus and hid the Subaru. Spann took the wheel of the Lexus and drove back to West Palm Beach, where they picked up Stevenson and Cooper at their homes. After stopping at a Burger King restaurant to pick up Cooper’s paycheck, the group drove back toward Sophia Hutchins’ house. As they were approaching the house, Spann and Philmore observed police officers waiting for them. Spann turned the Lexus around and the police followed. Spann subsequently led the police in a high-speed chase, first through a residential area and then onto Interstate 95, until he was forced to stop the car because of a blown tire. Spann and Philmore, each armed with a gun, fled the vehicle and went into a nearby orange grove, where they were caught five to six hours later.
In the course of his testimony, Philmore was questioned concerning his reasons for testifying against Spann. He said that he was aware the prosecution had not offered him any leniency in his own case and would be seeking the death penalty. He asserted that his decision to testify was not the result of any advice from his attorneys. Rather, Philmore explained that he felt bad about what had happened, that he was sorry, and that he wanted people to know he did not commit the crimes alone. He *819 stated, “[Spann] formulated the plans and we both carried them out, and I feel as though the death of Ms. Kazue Perron deserves justice.” Philmore admitted that he initially lied to police about his and Spann’s involvement in the crimes and that at first he did not intend to testify against Spann. He said that he and Spann exchanged letters while incarcerated and that in one of those letters, which was admitted into evidence, Spann instructed Philmore to testify that Spann did not have anything to do with the crimes. Spann wrote that Philmore should say that he picked up Spann at the home of Spann’s aunt after the robbery, and that Philmore should “make up a name” as to who his accomplice was. Philmore said he later heard that Spann was calling him a “big dummy” in jail and had told other inmates that Philmore would do whatever Spann told him to do. Philmore’s resentment against Spann contributed to his decision to testify.
2. Additional Witnesses at Trial
Philmore’s account was supported by numerous additional witnesses at trial. Michael Buss, owner of the pawn shop, testified that he was robbed at gunpoint by Philmore and Hutchins. He observed the robbers exit the store and run toward a dark blue compact car. The car’s tinted windows were up, however, so Buss could not see the driver. Keyontra Cooper and Latoya Stevenson also testified as witnesses for the State. According to Cooper, she and Stevenson were at Hutchins’ apartment with Spann and Philmore on the evening of November 13. She saw Spann, Philmore and Hutchins with several guns, which she identified at trial. During his own testimony, Buss identified the guns as the ones stolen from the pawn shop. Cooper and Stevenson testified that they went to a motel with Spann and Phil-more later that evening. Stevenson stated that at one point she and Cooper went to a convenience store, leaving Spann and Phil-more alone in the room. The next morning, Cooper was paged by a friend, who told her that the police were looking for Philmore. On hearing this, Philmore told Spann that he was broke and that he needed money to get out of town. Spann responded, “You know what we have to do.”
Cooper and Stevenson testified that they were dropped off at their homes between noon and 12:30 p.m. Kazue Perron’s husband, Jean Claude Perron, testified that he last saw his wife at 12:40 or 12:45 p.m., when she left for a 1:00 p.m. appointment at a residence on Elizabeth Avenue in Lake Park. Martha Solis, a housekeeper at another residence in Lake Park, testified that she was driving down Elizabeth Avenue on her way back from lunch when she observed a blue car parked in a nearby driveway. At trial, she identified the car as Spann’s Subaru. One black male who matched Philmore’s description was walking over a lawn toward the Subaru, while another black male sat in the driver’s seat. As she drove away, Solis observed a gold Lexus driving some distance behind her.
The robbery of the First Bank of Indi-antown was reported in a call to 911 at 1:58 p.m. Sandra Maguire, a bank teller, testified that a man she later identified as Philmore ran into the bank and grabbed approximately $1,000 in cash that was being deposited at her window. Catherine Donnelly, who was making the deposit, saw Philmore run out of the bank and get into the passenger side of a blue car. The windows of the car were down, and Don-nelly could see another black male in the driver’s seat. Leo Gomez was driving toward the First Bank at approximately 2:00 p.m. when a car occupied by two black males, traveling in the opposite direction, nearly hit his car head-on. Several police *820 officers testified concerning the discovery of the Subaru shortly afterward at a nearby pump station. The vehicle was registered in the name of Folia Spann, the wife of defendant Anthony Spann. Inside, police found a deposit ticket from the First Bank for $1,100.
Cooper testified that she was paged by Philmore at 2:28 p.m. She called Philmore, who told her that he and Spann were at Stevenson’s house and would pick her up in a few minutes. Stevenson testified that when Spann and Philmore picked her up in the Lexus, she asked where the car came from. Spann told her not to worry about it. Stevenson sat in the front passenger’s seat, while Spann drove and Philmore sat in the back seat. When Cooper was picked up several minutes later, she also asked about the car. Spann replied, “Just don’t worry about it, we got it.” Cooper also observed several magazines on the floor of the car with the name Kazue Per-ron on the mailing labels. Cooper asked about the magazines and, again, was told not to worry.
Cooper and Stevenson both testified that after Spann and Philmore picked them up, the group went to Burger King to eat and to pick up Cooper’s paycheck. Spann then drove the car toward Sophia Hutchins’ house. Stevenson said that on seeing the police cars in front of Hutchins’ house, Spann immediately turned the car around. When Spann saw that the police cars were following him, he began to speed. Jeffrey Nathanson of the West Palm Beach Police Department testified that the chase began at approximately 8:15 p.m. Nathanson said that the Lexus first sped through densely populated residential portions of West Palm Beach before turning onto Interstate 95, where the Lexus drove at speeds of 100 to 130 miles per hour. Stevenson testified that during the chase she opened the center console between the front seats and observed two guns. According to Cooper, Spann admitted during the chase that the Lexus was stolen.
Cooper and Stevenson each testified one of the car’s tires eventually blew out on the interstate and Spann was forced to pull the car over. Spann and Philmore jumped out of the car; Stevenson testified that each was carrying a gun as they fled. According to Cooper, Spann turned around and told the girls, ‘You better run.” The party fled into a nearby orange grove, where they encountered John Scarborough, the grove’s owner. Spann and Phil-more told Scarborough that they were running from the police because of a speeding incident, and Scarborough directed them toward a place in the grove where they could hide. When the police arrived shortly thereafter, Scarborough assisted them in the search. John Cummings of the Martin County Sherriffs Office testified concerning Spann and Philmore’s arrest several hours later. Cummings said that when they were finally discovered and arrested, Philmore was carrying $464.12 and Spann was carrying $545. Scarborough testified that he located two guns and a pager in the grove several days later near the area where Spann and Philmore were discovered. At trial, a firearm examiner identified one of the guns, a .380 caliber Tarus pistol, as the weapon used in the murder of Kazue Perron.
In a statement to law enforcement, which was played to the jury, Spann denied any involvement in the robberies and murder. He maintained that after leaving the motel on the morning of November 14, he went to the home of his aunt, Willie Brown; where he remained until Philmore picked him up that afternoon driving the Lexus. He said he did not ask Philmore where the Lexus came from; he thought that Philmore might have traded some drugs for the car. Spann said that he *821 drove himself to his aunt’s home in his Subaru. When asked how the Subaru ended up in Indiantown, Spann responded that Sophia Hutchins had previously asked to borrow the car and that he assumed she took it. He told police that the Subaru was not his, but rather that it was a “trash car” that anyone could use. In response, the State presented testimony by Spann’s aunt, who denied he was at her home that day. Spann’s wife, Folia Spann, testified that she purchased the car, that it was registered in her name, and that to her knowledge there was only one set of keys. She said that her husband never allowed anyone else to drive the car.
3. Postconviction Evidentiary Hearing
Philmore’s testimony at the postconviction evidentiary hearing largely followed the events recounted in his trial testimony, but removed Spann from any involvement in the crimes. Philmore claimed that he fabricated the story of Spann’s involvement based on advice from counsel. He stated, “[M]y attorney had told me at the time that it would be more believable that Spann had something to do with the crime and that it would kind of take the eyes off of me some and put them on him.” Phil-more also said he was telling the truth when he testified that he was resentful against Spann for calling him a “big dummy.”
Philmore testified at the evidentiary hearing that he began the day of November 13 at the home of Sophia Hutchins. However, Philmore said he did not remember whether Spann was there when he awoke and denied that Spann came up with the plan for the pawn shop robbery. Instead, he claimed that the plan was formulated by himself and Hutchins. Phil-more also denied having any knowledge as to whether Spann needed money to leave town. Philmore agreed that Spann’s Subaru was used in the robbery and said he lied at trial when he said he could not drive a stick-shift. Philmore admitted that he stole jewelry and four guns in the pawn shop robbery with Hutchins, but disputed that Spann was the getaway driver. On cross-examination, Philmore was pressed to identify the getaway driver if it was not Spann. Philmore refused at first to do so, stating that he would not incriminate someone who had not been charged with a crime. He eventually identified the driver as “Daryl Brooks.” According to Phil-more, he, Hutchins, and Brooks drove back to Hutchins’ house in the Subaru after the robbery. Philmore and Hutchins then went to a pawn shop to sell the stolen jewelry, while Brooks stayed behind. Philmore later sold one of the guns to another person. Philmore testified that he, Hutchins, and Brooks each kept one of the three remaining guns.
That evening, Spann and Philmore picked up Latoya Stevenson and Klki Cooper in Spann’s Subaru and brought them to a hotel. When asked where Brooks was at this point, Philmore responded, “At home, I guess.” Philmore denied discussing the next day’s bank robbery with Spann at the hotel. Philmore said he did not discuss the bank robbery with anyone until the next morning, when he and Spann dropped Stevenson and Cooper off at their homes, and Philmore dropped Spann off at his aunt’s house. Philmore then took Spann’s Subaru to pick up Brooks at Brooks’ home in Riviera Beach. Philmore said it was then that he had the idea to rob the bank. He told Brooks that he needed a vehicle to leave town because the police were looking for him. Philmore then recounted the events surrounding the carjacking and murder of Perron, replacing Spann with Brooks.
Concerning the bank robbery itself, Philmore testified that he robbed the bank while Brooks waited in the Subaru. After *822 committing the robbery, Philmore said he returned to the Subaru and gave half the money to Brooks. Brooks then drove them back to the Lexus. They hid the Subaru and fled in the Lexus, with Phil-more driving. Philmore said that he first took Brooks to a friend’s house in Riviera Beach. Philmore next picked up Spann from his aunt’s house in West Palm Beach. With Spann driving, Philmore and Spann then returned to Riviera Beach to pick up Stevenson and Cooper. The group went to pick up Cooper’s paycheck and began to drive back to Hutchins’ apartment. As Philmore recounted at Spann’s trial, the police saw the Lexus and a police chase ensued, resulting in the group’s eventual apprehension.
As its sole postconviction witness, the State presented testimony by Thomas Bakkedahl, who served as a prosecutor against both Philmore and Spann. Bakke-dahl stated that Philmore’s trial was held before Spann’s trial and that the jury recommended death by a vote of twelve to zero. Bakkedahl testified that although Philmore at first denied involvement, Phil-more admitted during a polygraph examination on November 23, 1997, that he and Spann murdered Perron. Philmore subsequently provided a full confession on November 26, which Bakkedahl testified was consistent with Philmore’s testimony at Spann’s trial. Bakkedahl stated that Phil-more initially refused to testify against Spann. After Philmore was tried and convicted but before he was sentenced, Phil-more changed his mind and agreed to testify at Spann’s trial. Bakkedahl said that he believed Philmore changed his mind because he was offended by comments that Spann had been making about him to other inmates. Bakkedahl also believed that Philmore was genuinely remorseful concerning his role in the death of Kazue Perron. When asked why Philmore would now recant his testimony, Bakkedahl expressed the opinion that Philmore was playing games with the court.
IV. ANALYSIS
To succeed in his motion for a new trial based on newly discovered evidence, Spann must satisfy both prongs of the test set forth in Jones II. “First, in order to be considered newly discovered evidence, the evidence ‘must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that [the] defendant or his counsel could not have known [of it] by the use of diligence.’ ” Jones II, 709 So.2d at 521 (quoting Torres-Arboleda v. Dugger, 636 So.2d 1321, 1324-25 (Fla.1994)). Here, Philmore’s recantation did not become known to Spann until after Spann’s initial postconviction proceedings were completed. As the trial court stated, “It is uncontested that Philmore’s recantation is newly discovered evidence.”
Under the second prong of Jones II, Spann must establish that “the newly discovered evidence [is] of such nature that it would probably produce an acquittal on retrial.” 709 So.2d at 521. When a claim of newly discovered evidence is based upon the recantation of testimony by a witness for the prosecution, the second prong of Jones II is met only where the defendant first establishes that the recanted testimony is truthful. See Davis, 26 So.3d at 526. In this case, on reviewing the evidence presented both at trial and in postconviction, the trial court determined that Philmore’s recantation was “not credible, untruthful, and exceedingly unreliable.” On review, we find ample evidence in the record to support the trial court’s finding.
In rejecting Philmore’s recanted testimony, the trial court first observed that Philmore’s recantation conflicted with the *823 timeline of events and additional corroborating evidence established by other witnesses at trial. With regard to the time-line of events, a 911 call placed the time of the bank robbery at 1:58 p.m. Thirty minutes later, at 2:28 p.m., Cooper received a page from Philmore, who told her that he and Spann had arrived at Stevenson’s residence in Riviera Beach. This evidence was generally consistent with the testimony of Rebecca Bagley, a crime scene investigator. At trial, Bagley testified that the distance between the hiding place of the vehicles near Indiantown and Stevenson’s residence was 80.6 miles and took approximately 31 minutes to drive. Thus, Phil-more’s original testimony that he and Spann drove directly from Indiantown to Stevenson’s residence was consistent with the timeline established by other evidence at trial.
In his recanting testimony, Philmore claimed that he drove from Indiantown to Riviera Beach, dropped off Brooks at a friend’s house, drove to the home of Willie Brown in West Palm Beach to pick up Spann, then returned with Spann to Riviera Beach to pick up Stevenson and Cooper. The trial court concluded that “this could not have been accomplished in the 30-minute period [between the bank robbery and Spann and Philmore’s arrival at Stevenson’s house] where the distance from Indiantown to Stevenson’s house alone was clocked at 30.6 miles taking 31 minutes to drive.” The trial court’s finding is supported by the trial testimony of Thomas Ranew, an investigator for the State. Ranew testified that he was asked to measure distances and travel times from the pump station where the Subaru was found, to the homes of Sophia Hutch-ins and Willie Brown in West Palm Beach, and then to Stevenson’s home in Riviera Beach.[5] Ranew stated that the total distance was 39.9 miles and took fifty-four minutes to drive. While the route given in Philmore’s recantation was somewhat different from the route Ranew traveled, we note that Ranew also testified he did not believe it was possible to drive from Indi-antown to West Palm Beach to Riviera Beach in only thirty minutes.
Philmore’s recantation conflicts with other evidence presented at trial. First, despite Philmore’s current claim that he drove Spann’s Subaru on several occasions, Philmore himself, as well as several additional witnesses, testified at trial that he could not drive a stick-shift vehicle. Second, Philmore now claims that he gave half the proceeds of the bank robbery, approximately $500, to Brooks rather than to Spann. Yet when Philmore and Spann were arrested, $545 was recovered from Spann. At the evidentiary hearing, Phil-more could not explain why Spann was in possession of nearly the exact amount he claimed to have given to Brooks. Additionally, although Philmore now claims to be telling the truth, it is notable that his recantation is also inconsistent with the alibi Spann gave to law enforcement after his arrest. Spann claimed that he drove himself to his aunt’s house in his Subaru and that Sophia Hutchins came by shortly thereafter and took the car. In Philmore’s recantation, however, he claimed that he dropped Spann off in the Subaru and then drove to Brooks’ house.
Furthermore, the trial court found that Philmore’s recantation was not supported by independent evidence. Although Phil- *824 more was the only witness to directly identify Spann as his coperpetrator in the offenses, significant circumstantial evidence pointed to Spann’s involvement. Philmore now claims that his accomplice was an individual named Daryl Brooks. However, the record contains no evidence to support Brooks’ involvement in the crimes, or even his existence. No witnesses at trial ever connected Brooks with the pawn shop robbery, the murder of Perron, or the bank robbery. At the postconviction evidentia-ry hearing, Philmore was evasive when asked to identify his accomplice to the offenses if Spann was not involved. The trial court wrote in its order that “Phil-more did not identify Brooks until after the threat that his recantation testimony could be stricken.” When pressed to explain how he knew Brooks, Philmore said only that he and Brooks were “in a relationship.” Spann presented no evidence in postconviction beyond Philmore’s testimony to support Philmore’s identification of Brooks.
Finally, this Court gives great deference to the trial court’s determination that Phil-more was not a credible witness. Initially, we take note of the evidence in the trial record concerning Spann’s efforts to influence Philmore’s testimony. Philmore testified at trial that Spann had instructed him in a letter to testify consistently with Spann’s original statement to law enforcement. In the letter submitted into evidence at trial, Spann wrote:
You have to tell them I didn’t have anything to do with it, and that you picked me up at Aunt Willie’s house in the LX. I don’t remember the time so don’t sweat that, but they also want to know who was with you if I wasn’t. So all you have to do is make up a name to tell them. Any name will do, the n* * * * can be dead it doesn’t matter. You remember Aunt Willie stays off of Tamarind on Adams St.... Oh yeah after you picked me up we go to Toya’s house, then Keykey’s [sic], after that Sophia’s and everything after that you know.
(Emphasis in original.)[6] At the postcon-viction hearing, prosecutor Thomas Bakke-dahl testified that Spann initially denied writing the letter, and admitted to doing so only after handwriting experts were retained.[7] That Spann previously sought to convince Philmore to alter his testimony clearly calls into question the veracity of Philmore’s recantation. Spann’s exhortation to Philmore to “make up a name” further undermines confidence in the truthfulness of Philmore’s current statements, particularly in light of Philmore’s unwillingness at the evidentiary hearing to provide information concerning Daryl Brooks.
The trial court provided an additional reason for finding Philmore not credible as a witness. Toward the end of the postcon-viction evidentiary hearing, the State questioned Philmore concerning his behavior during cross-examination. The State asked Philmore why he was smiling and why he appeared to be, in the State’s words, “kind of laughing” throughout the proceeding. Philmore responded that it was because the State kept asking him the same questions in different ways. The trial court addressed the exchange in its order:
As the State noted during the eviden-tiary hearing, the court observed multiple times when Philmore was smiling *825 during his testimony and seemed amused by what was happening. He was also evasive in some of his answers. For example, when questioned as to how he met Daryl Brooks, he smiled and responded, “It is personal.” He continued to evade answering the question, all the time smiling, until he finally admitted that he had a “relationship” with Brooks. On another occasion, Philmore started smiling as he testified “something happened along the way,” referring to the chain of events when he had Perron step out of her car and then shot her in the forehead. There were other times when Philmore smiled during his testimony, and the court finds that his demeanor was such that he was not taking his testimony seriously.
There are times when witnesses smile inappropriately during testimony out of nervousness. When Philmore was confronted with his smiling behavior, rather than explaining that he was nervous, he instead explained that he thought it was amusing that the State was asking him the same question multiple ways. That was not the impression of the court. Instead of taking his testimony seriously, it appeared to the court that Phil-more was amused about sparring with the State.
As this Court has observed, “the trial judge is there and has a superior vantage point to see and hear the witnesses presenting the conflicting testimony. The cold record on appeal does not give appellate judges that type of perspective.” Spaziano, 692 So.2d at 178. Thus, in determining whether the record supports the trial court’s finding that the recantation was not credible, we give great deference to the trial judge’s observations concerning Philmore’s demeanor.
Spann cites Johnson v. Singletary, 647 So.2d 106 (Fla.1994), in support of his claim that the trial court erred in denying his motion for a new trial. In Johnson, the defendant filed a motion for postcon-vietion relief, raising in part claims of newly discovered evidence. As attachments to his motion, Johnson submitted statements from four affiants claiming that another individual, who had previously died in federal prison, had admitted on more than one occasion to the killing of the victim. The trial court denied the claim without an evidentiary hearing. Id. at 109-10. On appeal, this Court reversed the trial court’s ruling and remanded for an eviden-tiary hearing on the claims concerning the newly discovered confessions. In doing so, however, we emphasized that our conclusion was based on the fact that, absent an evidentiary hearing, the additional evidence left open “at least a possibility of factual innocence.” Id. at 111. We further emphasized that our ruling did not pass upon the credibility of the affiants or the truthfulness or admissibility of the new evidence, and that we “reach[ed] no conclusion with respect to whether [the statements] would probably result in a new trial even if they are admissible.” Id.
The instant case is in a different procedural posture and involves a different standard of review. Here, unlike the trial court in Johnson, the trial court granted the request for an evidentiary hearing and evaluated the reliability of the newly discovered evidence and the credibility of the defendant’s witness. Thus, the sole question before this Court is whether the trial court’s decision is supported by competent, substantial evidence. See Lambrix, 39 So.3d at 272. Because we find competent and substantial evidence in the record to support the trial court’s conclusion that Philmore’s recantation is untruthful, the trial court’s denial of relief must be affirmed.
*826 V. CONCLUSION
For the reasons expressed in this opinion, we affirm the trial court’s denial of Spann’s successive motion for postconviction relief.
It is so ordered.
PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA and PERRY, JJ., concur.
CANADY, C.J., concurs in result.

. On August 2, 2004, Spann filed his initial motion for postconviction relief pursuant to rule 3.851. After holding a hearing pursuant to Huff v. State, 622 So.2d 982 (Fla.1993), as well an evidentiary hearing, and after permitting several amendments to the motion, the trial court denied all claims. This Court affirmed the trial court’s denial of postconviction relief. See Spann v. State, 985 So.2d 1059 (Fla.2008).

. Philmore himself was convicted of first-degree murder and sentenced to death, although his trial was severed from Spann's trial. This Court affirmed Philmore's convictions and death sentence on direct appeal. See Philmore v. State, 820 So.2d 919 (Fla.2002).

. While this Court’s opinion on direct appeal set forth a composite description of the offenses based on the evidence presented at trial, it was not necessary at that time to specifically identify which evidence came from Philmore and which evidence was presented through other witnesses. See Spann, 857 So.2d at 849-50.

. Philmore did not explain at trial why he and Spann wanted to leave Florida. Other evidence, presented both at trial and in postcon-viction, indicated that there were serious criminal charges pending against Philmore and Spann at the time these events took place.

. Ranew was asked to measure the distance to Hutchins’ house in West Palm Beach in response to an argument by Spann's counsel that the black male observed with Philmore by several witnesses was in fact Hutchins. Although these witnesses could not conclusively identify the individual they observed as Spann, they stated unequivocally that it was not Hutchins.

. Spann wrote in the margin next to the underlined portion of the letter, “This is a big deal right here.''

. The admissibility of handwriting expert testimony was an issue in Spann’s direct appeal. See Spann, 857 So.2d at 851.