# Supreme Court of Florida

_____

No. SC17-707
_____

**STATE OF FLORIDA**,
Appellant/Cross-Appellee,

vs.

**GERALD DELANE MURRAY**,
Appellee/Cross-Appellant.

_____

No. SC18-334
_____

**GERALD DELANE MURRAY**,
Appellant,

vs.

**STATE OF FLORIDA**,
Appellee.

_____

No. SC18-560
_____

**GERALD DELANE MURRAY**,
Petitioner,

vs.

December 20, 2018

PER CURIAM.

The State appeals, and Gerald Delane Murray cross-appeals, the partial grant and partial denial of Murray's initial postconviction motion filed under Florida Rule of Criminal Procedure 3.851. Murray also appeals the denial of his successive postconviction motion and petitions this Court for a writ of habeas corpus.[1] For the reasons explained below, we affirm the trial court's orders and deny habeas relief.

I. BACKGROUND

In 2009, this Court affirmed Murray's conviction for first-degree murder and sentence of death after four trials and three convictions for the murder of 59-year-old Alice Vest in 1990. *Murray v. State*, 3 So. 3d 1108, 1112 (Fla. 2009). On direct appeal, this Court described the facts as follows:

> The evidence presented at the fourth trial revealed that on September 15, 1990, the victim, Alice Vest, arrived home around 11:30 p.m. after having dinner with a friend. When her friend called the next morning on September 16, however, Ms. Vest did not answer the phone. Concerned, the friend called one of Ms. Vest's neighbors and asked him to check on her. The neighbor went to Ms. Vest's home and observed that one of her window screens was out of the

---

1. We have jurisdiction. *See* art. V, § 3(b)(1), (9), Fla. Const.

- 2 -

window and that her screen door was propped open. Her phone lines had been cut. After telling his wife to call 911, the neighbor and another man looked inside the home and discovered Ms. Vest's body draped off of her bed with her head on the floor.

According to the medical examiner's testimony, the cause of death was strangulation with multiple stab wounds as a contributing factor. Ms. Vest was also badly beaten with a metal bar, a candlestick holder, and a broken bottle that left bruising around her neck, breasts, and knees. She also had a black eye, a broken jaw, multiple contusions, and at least twenty-four stab wounds over her face, neck, upper and lower back, abdomen and thigh. Most of the stab wounds were knife wounds, but some were consistent with infliction by a pair of scissors found near her body. Ms. Vest had been strangled with a web belt and two electrical cords. She was also both vaginally and anally raped.

According to James Fisher, earlier on September 15, 1990, Murray, Steve Taylor, and Fisher played pool together after which, at around 11:50 p.m., Fisher dropped Murray and Taylor off at a corner less than a mile from Murray's home. Fisher then went home and went to bed.

Juanita White, who lived approximately two miles from the victim's house, testified that, around 12:40 a.m., she saw Murray and Taylor in her barn and watched the men run away after she sent her dog to attack them. Murray's brother further testified that both Taylor and Murray left town the next day.

Evidence recovered from the scene of the crime included six footprints, five from a Britannia shoe, which Taylor was known to wear, and one that was unidentified. No fingerprints were recovered from the scene that could be tied to either Taylor or Murray. Semen was found inside the victim but the results were inconclusive. Semen was also discovered on a blouse and on a comforter and was found to be the same blood type as Taylor[2] but not Murray. None of the blood spatters at the scene could be tied to either Taylor or Murray.

_____

2. The death sentence and convictions of Taylor, Murray's codefendant, were affirmed on direct appeal in *Taylor v. State*, 630 So. 2d 1038, 1040 (Fla. 1993) (concluding that DNA evidence linked Taylor to the victim because "the analyst testified that semen found in the victim's blouse matched Taylor's DNA profile").

But pubic hairs recovered from the victim's body and from a nightgown were found to have the same microscopic characteristics as Murray's pubic hair, but not Taylor's. Jewelry stolen from the victim's home was linked to both Taylor[3] and Murray.

Additional evidence presented at trial revealed that approximately six months after his indictment for the murder of Alice Vest, Murray escaped from prison. One of his co-escapees, Anthony Smith, testified that, while out, Murray told him about his role in Vest's murder. According to Smith, Murray said that on the night of the murder Taylor came over to his house and wanted to go out. Murray initially refused, but Taylor was eventually able to change his mind after the two drank some beer. Thereafter, Taylor convinced Murray to break into a house. Together, the pair broke into what Murray thought was an unoccupied residence. When Murray discovered the owner was home, he wanted to leave, but Taylor grabbed the female occupant, handed Murray a knife, and sexually assaulted her. Afterwards, Murray had the victim perform oral sex on him. Murray then wandered through the house looking for things to steal. He returned to the bedroom five or ten minutes later and discovered that Taylor had stabbed the victim about fifteen or sixteen times but she was not dead. Murray and Taylor then secured some sort of cord and, together, they choked the woman to death. After they killed her, they took whatever was valuable and left. Approximately seven months after his escape, Murray was captured in Las Vegas, Nevada.

The jury in Murray's fourth trial reached a verdict of guilty as charged on all counts. During the penalty phase, the State introduced evidence of Murray's other violent felonies. But, pursuant to Murray's instructions, the defense did not introduce any mitigation evidence. After the penalty phase closing arguments, the jury recommended a death sentence by a vote of eleven to one.

Thereafter, the court held a *Spencer* hearing and Murray again declined to present any mitigation evidence. The next day, the trial court followed the jury's recommendation and sentenced Murray to death, finding that the aggravators outweighed the mitigating

---

3. Evidence presented at Taylor's trial was that a bag was discovered buried in Taylor's backyard that "contained the pieces of jewelry taken from the victim's home during the attack and burglary." *Taylor*, 630 So. 2d at 1040.

circumstances. Specifically, the trial court found four aggravating factors: (1) Murray was previously convicted of three felonies involving violence (great weight); (2) he was engaged in a burglary and/or sexual battery at the time of the commission of the murder (immense weight); (3) the crime was committed for financial gain (some weight); and (4) the crime was especially heinous, atrocious and cruel (great weight). The trial court rejected two statutory mitigating circumstances: (1) the crime was committed by another person, and Murray's participation was relatively minor; and (2) Murray's capacity to appreciate the criminality of his conduct was substantially impaired. However, the trial court found the following nonstatutory mitigating circumstances: (1) the untimely death of Murray's wife (very little weight); (2) Murray was incapable of forming relationships with people (very slight weight); (3) he had problems as a youth (little weight); (4) his lack of education and little contact with his father (slight weight); and (5) his mental evaluation after his arrest for aggravated assault (little weight).

*Murray*, 3 So. 3d at 1112-14 (footnotes omitted).

This Court affirmed Murray's convictions and sentence on direct appeal. *Id.* at 1126.[4] When reviewing sufficiency of the evidence, this Court identified evidence presented at trial consistent with Murray's guilt as follows:

---

4. On direct appeal, Murray argued that:

(A) the trial court erred by admitting hair evidence recovered from the victim's body; (B) the trial court erred by admitting hair evidence recovered from the victim's nightgown; (C) the trial court erred by admitting the testimony of a hair and fiber expert and limiting Murray's cross-examination of him; (D) the trial court erred by denying Murray's motion to dismiss his indictment; (E) the trial court erred by denying Murray's right to interview grand jury witnesses; (F) the trial court erred in allowing the State to strike an African-American juror without providing a legitimate race-neutral reason; (G) the trial court erred by denying Murray's motion for mistrial due to juror misconduct; (H) the trial court erred in not giving the jury

(1) the testimony of a jailhouse informant (Smith) detailing Murray's confession; (2) the evidence collected from the scene and the testimony of the medical examiner which, together, confirmed the details of the crime as Murray related them to Smith; (3) the testimony of several witnesses who placed Murray with Taylor in the vicinity of the crime near the time the crime was committed; (4) testimony describing the presence of two different shoe prints as well as multiple weapons, implying that more than one person committed this crime; (5) the implication of consciousness of guilt since Murray left town the next day and later escaped from incarceration; (6) evidence connecting Murray and Taylor to Ms. Vest's stolen jewelry; (7) the incriminating statements Murray made to Detective O'Steen; and (8) the presence of pubic hair recovered from Ms. Vest's body and nightgown which was found to have the same microscopic characteristics as Murray's known pubic hair.

*Id.* at 1125. Murray petitioned the United States Supreme Court for certiorari, which was denied. *Murray v. Florida*, 558 U.S. 949 (2009).

Thereafter, Murray filed a motion for postconviction relief that was amended four times. After holding two evidentiary hearings, the postconviction court granted a new penalty phase pursuant to *Hurst*,[5] but denied relief on all other claims. Murray sought to amend his motion again, but was instead allowed to file

---

further instruction regarding the meaning of "abiding conviction of guilt" when requested; (I) the trial court erred in allowing former trial testimony to be read to the jury; (J) the trial court erred in not dismissing his case because of double jeopardy; and (K) there was insufficient evidence to convict Murray of the offenses charged.

*Murray*, 3 So. 3d at 1114.

5. *Hurst v. Florida*, 136 S. Ct. 616 (2016); *Hurst v. State*, 202 So. 3d 40 (Fla. 2016).

- 6 -

his additional claim in a successive motion for postconviction relief.   The

postconviction court summarily denied relief on his successive claim.

## II.  ANALYSIS

The State appeals the grant of *Hurst* relief, and Murray cross-appeals the

denial of his other initial postconviction claims, and the summary denial of his

successive postconviction motion.  Murray also petitions this Court for a writ of

habeas corpus.

## A.  INITIAL POSTCONVICTION MOTION

### 1. *Hurst*

The State argues that the trial court erred by granting Murray a new penalty

phase pursuant to *Hurst*.  However, because Murray's jury recommended the death

penalty by a vote of eleven to one, and because this Court has consistently and

repeatedly granted capital defendants new penalty phases post-*Hurst* where there

were nonunanimous jury recommendations in cases that became final after *Ring*,[6]

we affirm the postconviction court's grant of the new penalty phase.  *See State v.*

*Smith*, 251 So. 3d 807, 810 n.3 (Fla. 2018) (citing 21 cases where this Court has

granted new penalty phases for cases involving nonunanimous jury

recommendations).

---

6.  *Ring v. Arizona*, 536 U.S. 584 (2002).

## 2. Anthony Smith

Murray argues that the postconviction court erred when it denied his newly discovered evidence claim based on evidence that the State's witness, Anthony Smith, was coerced to testify against Murray and believed the State would reduce Smith's sentence in exchange for testifying. Murray bases this claim on statements Smith alleged in Smith's own 3.850 motion and a letter Smith wrote to the prosecutor on January 26, 2006. Murray asserts that it is probable that a jury on retrial hearing the impeachment evidence against Smith would discredit his testimony and acquit Murray.

To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements. *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998). First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known it though due diligence. *Id.* "Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." *Id.*

Newly discovered evidence satisfies the second prong of the *Jones* test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." *Id.* at 526 (quoting *Jones v. State*, 678 So. 2d 309, 315 (Fla. 1996)). In determining whether the evidence compels a new trial, the postconviction court must "consider all newly discovered evidence which would

be admissible" and must "evaluate the 'weight of both the newly discovered evidence and the evidence which was introduced at the trial.' " *Id.* at 521 (quoting *Jones*, 591 So. 2d at 916). This determination includes

> whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether the evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.

*Id.* (citations omitted). "When a claim of newly discovered evidence is based upon the recantation of testimony by a witness for the prosecution, the second prong of *Jones II* [709 So. 2d at 512] is met only where the defendant first establishes that the recanted testimony is truthful." *Spann v. State*, 91 So. 3d 812, 822 (Fla. 2012).

This Court "review[s] the trial court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence." *Green v. State*, 975 So. 2d 1090, 1100 (Fla. 2008). However, we "review the trial court's application of the law to the facts de novo." *Id.*

Although Smith's 3.850 motion and letters would constitute a recantation of testimony if the allegations contained in them were taken as true, Murray's claim of newly discovered evidence is not based upon the recantation of testimony, but on the impeachment value of Smith's untruthful pleadings. When confronted at Murray's postconviction evidentiary hearing with his 3.850 motion and letter to the prosecutor, Smith admitted that those were not true but instead a ploy to attempt to

get a sentence reduction. Smith repeatedly testified at Murray's second evidentiary hearing that Smith was truthful in his testimony at Murray's trial. The postconviction court found that "Smith was credible when he made clear that his 3.850 claims were false and that the State did not offer him a reduced sentence if he testified against" Murray in his testimony at Murray's postconviction evidentiary hearing. "[I]n determining whether the record supports the trial court's finding that the recantation was not credible, we give great deference to the trial judge's observations . . . ." *Spann*, 91 So. 3d at 825. The veracity of Smith's evidentiary hearing testimony is further corroborated by the fact that Smith testified consistently through four trials about Murray's admission to him after they escaped jail together.

Additionally, Smith was impeached at Murray's fourth trial in several respects. First, Smith was impeached with evidence that the State agreed to waive the death penalty in Smith's first-degree murder case in exchange for his testimony in Murray's case. Second, Smith was impeached with his eight prior felonies. Third, he was impeached with the inconsistencies in his deposition as to facts of his escape with Murray, and between the facts of Murray's role in the murder and his written statement and testimony. Fourth, Smith was impeached as to the bank robberies he completed after his escape from jail. Fifth, he was impeached with

- 10 -

the specific facts of his murder conviction.  Finally, Smith was impeached with the fact that he had seen the television depiction of Murray's case.

Accordingly, it is not probable that the additional impeachment evidence would produce an acquittal on retrial.  Therefore, we affirm the postconviction court's denial of this claim.

## 3.  Expert Microscopist

Murray argues that his counsel was ineffective for failing to present an expert microscopist in rebuttal to the State's hair expert.  The postconviction court found that counsel was not deficient because he consulted with a hair and fiber expert and made a strategic decision not to call him as a defense expert.  We affirm the denial of relief.

Following the United States Supreme Court's decision in *Strickland*,[7] this Court has explained that, to prevail on an ineffective assistance of counsel claim, a defendant must satisfy two requirements:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

---

7.  *Strickland v. Washington*, 466 U.S. 668 (1984).

*Bolin v. State*, 41 So. 3d 151, 155 (Fla. 2010) (quoting *Maxwell v. Wainwright*, 490 So. 2d 927, 932 (Fla. 1986)).

Regarding *Strickland*'s deficiency prong, there is a strong presumption that trial counsel's performance was not ineffective. *Strickland*, 466 U.S. at 689. Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Regarding the prejudice prong, "*Strickland* requires defendants to show 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [A] 'reasonable probability' is a 'probability sufficient to undermine confidence in the outcome.' " *Henry v. State*, 948 So. 2d 609, 621 (Fla. 2006) (citations omitted) (quoting *Strickland*, 466 U.S. at 694).

Because both prongs of *Strickland* present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. *See Sochor v. State*, 883

So. 2d 766, 771-72 (Fla. 2004). Moreover, "when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong." *Zakrzewski v. State*, 866 So. 2d 688, 692 (Fla. 2003) (quoting *Waterhouse v. State*, 792 So. 2d 1176, 1182 (Fla. 2001)).

Here, Murray did not demonstrate deficiency. At both postconviction evidentiary hearings, Murray's counsel testified that he did not call a hair and fiber expert to testify because the hair at issue had been consumed by DNA testing. Thus, counsel made the strategic decision to use information gained from discussion with the expert to call into question the testing methods utilized by Joseph DiZinno, the State's expert.

Additionally, Murray did not prove prejudice. Trial counsel effectively utilized the information he gained from talking to an independent expert to challenge DiZinno's testing and to elicit through cross-examination that there was no proficiency testing, no written protocols, and no database of hair characteristic when the hair analysis was conducted. Therefore, Murray has not shown a reasonable probability that the sentence imposed would have been different had defense counsel presented its own expert witness. In other words, our confidence is not undermined.

Accordingly, we affirm the postconviction court's denial of relief.

**4. Newly Discovered Evidence Regarding DiZinno's Testimony**

- 13 -

Next, Murray argues that the postconviction court erred in denying his newly discovered evidence claim regarding Joseph DiZinno's trial testimony. Specifically, Murray claims that newly discovered evidence — a 2013 review by the Department of Justice (DOJ) of DiZinno's lab work and testimony in Murray's trial — establishes that DiZinno's trial testimony regarding the hair evidence is false and misleading. However, we affirm the denial of this claim.

A defendant must satisfy a two-prong test in order to obtain relief on the basis of newly discovered evidence:

> First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.

*Marek v. State*, 14 So. 3d 985, 990 (Fla. 2009). "Newly discovered evidence satisfies the second prong of this test if it 'weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.'" *Henry v. State*, 125 So. 3d 745, 750 (Fla. 2013) (quoting *Heath v. State*, 3 So. 3d 1017, 1023-24 (Fla. 2009)).

Murray has met the first prong of the newly discovered evidence test because the 2013 DOJ review could not have been previously discovered by Murray or trial counsel by due diligence because it did not exist at the time of trial.

However, in *Duckett v. State*, 231 So. 3d 393, 396-401 (Fla. 2017), this Court rejected claims of newly discovered evidence, *Brady*,[8] and *Giglio*[9] violations related to a 2014 Department of Justice review of FBI hair and fiber analyst Michael Malone. *Duckett* involved a nearly identical report with similar conclusions about the report and testimony of hair and fiber expert Malone. In *Duckett*, this Court determined that Duckett failed to establish that the 2014 DOJ review of the hair and fiber analyst's work and testimony in the defendant's trial was of such a nature that it would probably produce an acquittal on retrial, as required to be granted a new trial based on newly discovered evidence. *Id.* at 400. This Court reasoned that although the review indicated that the analyst's lab reports and testimony contained some erroneous statements that exceeded the limits of science, the testimony also accurately represented the reliability of hair analysis, that the testimony was challenged extensively, that the field of forensic hair science was not discredited, and that the hair evidence was not the only evidence to tie Duckett to the murder. *Id.* at 399-400.

Similar to *Duckett*, Murray has failed to meet the second prong of the newly discovered evidence test because Murray has failed to demonstrate that the alleged

8.  *Brady v. Maryland*, 373 U.S. 83 (1963).

9.  *Giglio v. United States*, 405 U.S. 150 (1972).

- 15 -

newly discovered evidence, the 2013 DOJ review, would probably produce an acquittal on retrial. First, Murray has not established that DiZinno's trial testimony, when considered in its full context, was false. Although the 2013 DOJ review concluded that DiZinno's lab reports or trial testimony contained some erroneous and invalid statements that exceeded the limits of science, the full context of DiZinno's trial testimony indicates that DiZinno used limiting language intended to limit his conclusions. This is supported by the testimony of Richard McNally, the section chief of the science and technology branch in the General Counsel's office at the FBI, who testified at Murray's postconviction evidentiary hearing that the review did not take into account the limiting language of DiZinno in context, but looked only at the individual statements. Second, DiZinno's testimony was challenged at trial. Murray's counsel extensively challenged DiZinno's credibility during cross-examination and even objected prior to his testimony as to the lack of procedures and protocols. Third, even according to Jason Beckert, who testified for Murray on the subject of microscopy at the postconviction evidentiary hearing, the field of forensic hair analysis has not been discredited and the FBI has not discontinued the use of such analysis. Beckert further testified at the postconviction hearing that the errors attributed to DiZinno were not errors at all. As explained in the letter from the FBI itself, the science underling microscopic hair comparison was not the subject of the 2013 DOJ

review.  Given this context, the newly discovered evidence does not give rise to a reasonable doubt as to Murray's culpability.

Accordingly, we affirm the postconviction court's denial of this claim.

**5.  Identification of Pieces of the Victim's Jewelry**

Murray also argues that his trial counsel was ineffective in failing to object to hearsay testimony related to an officer's testimony identifying the jewelry as the victim's.  We conclude that the postconviction court did not err in denying this claim.

First, Murray failed to demonstrate deficiency.  Trial counsel testified at the postconviction evidentiary hearing that he did not object to Detective O'Steen's comment about the jewelry because he recalled that O'Steen had visibly seen a photograph of the victim wearing that particular jewelry item prior to discovering the jewelry and had made that conclusion on his own.  Additionally, trial counsel testified that the issue of the jewelry being the victim's was well-settled and strategically not an issue worth fighting.  This was a strategic decision.  *See Patrick v. State*, 246 So. 3d 253, 262 (Fla. 2018) ("A decision that lodging a particular challenge to the validity of evidence would be a waste of resources in light of counsel's knowledge of corroborating facts can be a reasonable strategic decision.").

Second, Murray failed to demonstrate prejudice. At the postconviction evidentiary hearing, trial counsel testified that Murray's theory of the case was that Taylor was the sole perpetrator of the crime, a trial strategy established by the record. Counsel further testified that the jewelry discovered in Taylor's backyard supports this theory and that it was strategically not worth trying to fight about it because it was a well-settled issue that the jewelry was identified as being the victim's. Thus, Murray has not demonstrated a reasonable probability of a different outcome had counsel objected. In other words, our confidence is not undermined.

Accordingly, we affirm the denial of relief.

## 6. Shoeprint Expert

Additionally, Murray claims that trial counsel was ineffective for failing to retain an expert on shoeprint analysis to rebut the testimony of the State's expert, John Wilson. Murray alleges that a defense expert could testify that the shoeprints found in the victim's home were from one individual. We affirm the denial of this claim.

This Court has explained that it is not necessary for defense counsel to retain a defense expert "where defense counsel cross-examined the State's experts to establish the facts necessary for the defense." *Belcher v. State*, 961 So. 2d 239, 250 (Fla. 2007). Even if "arguably trial counsel's strategy may have ultimately

been unsuccessful, [the defendant] cannot now properly challenge an informed, strategic decision of counsel in the hindsight of postconviction." *Dufour v. State*, 905 So. 2d 42, 62 (Fla. 2005). "The defendant bears the burden to 'overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " *McCoy v. State*, 113 So. 3d 701, 707 (Fla. 2013) (quoting *Strickland*, 466 U.S. at 689).

In this case, Murray failed to demonstrate deficiency. Trial counsel testified at the postconviction evidentiary hearing that he spoke with Wilson prior to trial, and Wilson told counsel there was only one set of footprints. Thus, counsel's strategic decision to not call a shoeprint expert was reasonable given the information he had been provided by the State's expert that there was only one set of footprints. Ultimately at trial, Wilson's testimony implied that one print may have come from a different shoe. Because this testimony was different from Wilson's prior reports, counsel thoroughly cross-examined Wilson about the discrepancy dealing with the shoe impressions, specifically asking Wilson to read from his report anywhere it mentions the possibility of any shoes other than Britannia shoes. Further, trial counsel moved to strike Wilson's testimony, and that was denied. Counsel further addressed the discrepancy in Wilson's testimony in closing argument. Because trial counsel's cross-examination brought out all the

material points Murray claims an expert could have presented, Murray did not demonstrate deficiency.

Second, Murray failed to demonstrate prejudice. Wilson explained at trial that he could not say for sure that the unidentified print came from a different shoe. Further, Wilson testified that there was no way he could testify as to how many people were inside the victim's house at the time of the victim's murder. Murray's argument to this Court that "no expert has ever testified that there was more than one type of shoeprint found at the scene" supports the conclusion that there was no prejudice, particularly given trial counsel's effective cross-examination. Thus, Murray has failed to establish a reasonable probability of a different result if trial counsel had retained a shoeprint expert. In other words, our confidence in the outcome is not undermined.

Accordingly, we affirm the denial of this claim.

## 7. Other Claims

Murray further contends that the postconviction court erred in denying several of his initial postconviction claims without an evidentiary hearing. Specifically, Murray claims that the postconviction court erred in summarily denying the following eight[10] unrelated issues: (1) trial counsel was ineffective in

_____

10. In addition to these eight issues, Murray mentioned in a footnote in his brief that he wishes to appeal all claims in his initial postconviction motion that did not receive an evidentiary hearing; however, Murray failed to present argument to

failing to request a *Richardson*[11] hearing and to move for a mistrial regarding John Wilson's trial testimony that reconciled the discrepancy in the chain of custody of the hair from the victim's nightgown, for failing to discover that Wilson put the lotion bottle in the plastic bag, and for inadequately preparing for trial with respect to the tampering claim;[12] (2) trial counsel was ineffective in failing to impeach Anthony Smith, who testified as to Murray's role in the victim's murder; (3) the State's failure to disclose the DOJ's investigation into DiZinno violated *Brady*; (4) the State's failure to disclose that DiZinno's initials on the hair evidence were written by someone else violated *Brady*, and trial counsel was ineffective in failing to object to this *Brady* violation or request a *Richardson* hearing; (5) the presentation of DiZinno's testimony violated *Giglio*; (6) trial counsel was ineffective for failing to request a *Richardson* hearing because DiZinno did not

---

this Court and, therefore, waived the unbriefed claims. *See Braddy v. State*, 219 So. 3d 803, 825 (Fla. 2017).

11. *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

12. To the extent Murray is attempting to relitigate the admission of the hair evidence that either was or could have been raised on direct appeal, it is procedurally barred. *See Reaves v. State*, 826 So. 2d 932, 936 n.3 (Fla. 2002). Additionally, we agree with the postconviction court that the addition to Wilson's testimony did not materially alter or change a previous statement, did not rise to the level of a discovery violation, and would not have supported a *Richardson* hearing. And trial counsel raised multiple challenges to the chain of custody in an effort to prevent the State from admitting the hair evidence due to tampering and at trial identified the suspicious nature of Wilson's testimony and challenged his credibility. Therefore, Murray could not prove deficiency under *Strickland*.

personally receive, mount, or initial the items into evidence; (7) trial counsel was ineffective for failing to challenge the State's use of peremptory challenges to exclude jurors; and (8) trial counsel was ineffective for failing to properly preserve two instances of juror misconduct. However, because these claims were facially insufficient, procedurally barred, or without merit, we affirm the trial court's summary denial. *See Amendments to Fla. Rules of Crim. Pro. 3.851, 3.852, & 3.993*, 772 So. 2d 488, 491 n.2 (Fla. 2000) (explaining that an evidentiary hearing must be held on an initial 3.851 motion whenever the movant makes a facially sufficient claim that requires a factual determination); *Teffeteller v. Dugger*, 734 So. 2d 1009, 1023 (Fla. 1999) ("Trial counsel cannot be deemed ineffective for failing to raise meritless claims or claims that had no reasonable probability of affecting the outcome of the proceeding.").

Additionally, "because all issues which were not barred were meritless, we can find no cumulative error." *Johnson v. Singletary*, 695 So. 2d 263, 267 (Fla. 1996).

### B. SUCCESSIVE POSTCONVICTION MOTION

In the appeal of the denial of his successive postconviction motion, Murray contends that newly discovered evidence demonstrates that Murray is innocent, entitling him to an evidentiary hearing and a new trial. This alleged newly discovered evidence is from James Dixon, a person of interest during the original

homicide investigation in this case, who claims that Walter Holton committed the murder, not Murray or Taylor. The affidavit of James Dixon, taken on September 15, 2017, states the following:

> I, James Dixon worked for Walter Holton in the early 90s doing odd jobs. Holton sold large amounts of cocaine with a Cuban Friend from Miami, who drove a Porsche. Both men were dangerous if you crossed them and were known to put contract hits out on people who crossed them. I was questioned by Police about a sailboat necklace that was possibly connected to a homicide. I got the sailboat necklace from Angela Smith, who was the girlfriend of Walter Holton at the time. She told me that she got it from his Cuban friend, who told her to "never get rid of it." I did not tell the police where I got the necklace from, because I was afraid of Walter Holton and his Cuban friend. My DNA was collected by the police and I was cleared of any involvement with the homicide case.

We have affirmed the summary denial of a newly discovered evidence claim filed in Taylor's case based on James Dixon's affidavit. *See Taylor v. State*, No. SC18-520 (Fla. Dec. 20, 2018). We do so as well here.

> As this Court has explained:

> A successive rule 3.851 motion may be denied without an evidentiary hearing if the records of the case conclusively show that the movant is entitled to no relief. *See* Fla. R. Crim. P. 3.851(f)(5)(B). This Court reviews the circuit court's decision to summarily deny a successive rule 3.851 motion de novo, accepting the movant's factual allegations as true to the extent they are not refuted by the record, and affirming the ruling if the record conclusively shows that the movant is entitled to no relief.

*Kormondy v. State*, 154 So. 3d 341, 351 (Fla. 2015) (quoting *Walton v. State*, 3 So. 3d 1000, 1005 (Fla. 2009)). This "Court will uphold the summary denial of a

newly-discovered-evidence claim if the motion is legally insufficient or its allegations are conclusively refuted by the record." *Ventura v. State*, 2 So. 3d 194, 198 (Fla. 2009).

Here, the factual allegations of the newly discovered evidence claim based on James Dixon's affidavit are directly and conclusively refuted by the following portions of the record: (1) testimony from Joseph DiZinno, the expert at the FBI, matching the pubic hair recovered from Ms. Vest's body and nightgown with the microscopic characteristics as Murray's pubic hair;[13] (2) the testimony of Smith detailing Murray's confession; (3) evidence connecting Murray and Taylor to Ms. Vest's jewelry; and (4) incriminating statements Murray made to Detective O'Steen. The bag of jewelry, including a sailboat piece that the detective discussed at both Murray and Taylor's trials, was found buried in a bag at Taylor's former place of residence. *See Taylor*, 630 So. 2d at 1039-40 ("In January, 1991, while Taylor's former roommate was removing a fence behind the duplex, he discovered a small plastic bag buried in the ground near the fence. The bag contained the pieces of jewelry taken from the victim's home during the attack and burglary."). At Murray's trial, Murray's brother and a friend testified that in

---

13. During postconviction proceedings, STR testing on DNA extract of the hair was conducted by FDLE and then by a defense expert. FDLE found Murray to be a match for "Q20, Hair #5," and the defense expert was unable to exclude Murray.

February 1991 they saw Taylor go into the backyard of the duplex he lived in previously and return with dirty hands from digging. Additionally, Taylor's semen DNA that was found on the victim's blouse contradicts Dixon's theory that Taylor was not involved in the murder. *Taylor*, 630 So. 2d at 1040.

Accordingly, we affirm the summary denial of Murray's successive postconviction motion.

## C. HABEAS PETITION

### 1. Burglary Jury Instruction

In his petition for habeas relief, Murray alleges that appellate counsel was ineffective for failing to allege fundamental error based on the unobjected to "remaining in" language contained in the jury instruction for burglary. However, we deny relief.

The standard of review for claims of ineffective assistance of appellate counsel mirrors the *Strickland* standard for ineffective assistance of trial counsel. *Valle v. Moore*, 837 So. 2d 905, 907 (Fla. 2002). In order to grant habeas relief on ineffectiveness of appellate counsel, this Court must determine

> first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

*Pope v. Wainwright*, 496 So. 2d 798, 800 (Fla. 1986) (citing *Johnson v.*
*Wainwright*, 463 So. 2d 207, 209 (Fla. 1985)).

Additionally, appellate counsel cannot be deemed ineffective for failing to
raise meritless issues or issues that were not properly raised in the trial court and
are not fundamental error. *Valle*, 837 So. 2d at 908. "In fact, appellate counsel is
not necessarily ineffective for failing to raise a claim that might have had *some*
possibility of success; effective appellate counsel need not raise *every conceivable*
nonfrivolous issue." *Id.* (citing *Jones v. Barnes*, 463 U.S. 745, 751-53 (1983);
*Provenzano v. Dugger*, 561 So. 2d 541, 549 (Fla. 1990)). Jury instructions "are
subject to the contemporaneous objection rule, and, absent an objection at trial, can
be raised on appeal only if fundamental error occurred." *State v. Delva*, 575 So. 2d
643, 644 (Fla. 1991).

Murray did not meet his burden of proving that appellate counsel was
ineffective for not litigating this claim of instructional error on direct appeal
because Murray did not demonstrate that the unobjected to "remaining in"
language included in the burglary instruction was error that rises to the level of
fundamental error.

This case is factually distinguishable from *Floyd v. State*, 850 So. 2d 383
(Fla. 2002). In *Floyd*, this Court reversed a burglary conviction where the jury
instruction included the "remained in" language. *Id.* at 402. The evidence in

- 26 -

*Floyd* supported that the victim and the defendant knew each other, had an extended discussion on the victim's porch and in the house prior to the shooting. *Id.* This Court reasoned that the facts did not support a "surreptitious remaining" because it could be argued that the defendant's intent to commit a crime formed after he entered the victim's house. *Id.* at 402. Therefore, when the facts cannot support a "surreptitious remaining" after a consensual entry, inclusion of the "remaining in" language from the standard jury instruction constitutes fundamental error. *Id.*

In the present case, the record supports that Murray broke into the victim's house in order to gain entry, and not after a consensual entry. Specifically, this Court summarized that "one of her window screens was out of the window and that her screen door was propped open. Her phone lines had been cut." *Murray*, 3 So. 3d at 1113. There is no plausible analysis under which the jury could have concluded that the defendant entered the victim's house without criminal intent and only formed criminal intent while "remaining in" the victim's house. As applied to the facts of Murray's case, the inclusion of the "remaining in" language in the burglary instruction was mere surplusage and not fundamental error. Thus, because including the "remaining in" language in the jury instruction was not fundamental error, appellate counsel cannot be deemed ineffective for not raising

an unpreserved claim on appeal. *See Rodriguez v. State*, 919 So. 2d 1252, 1281 (Fla. 2005).

Accordingly, we deny this claim.

## 2. Juror Vaccaro

Murray next argues that appellate counsel was ineffective for failing to raise on direct appeal a claim that the trial court abused its discretion in denying his cause challenge of juror Vaccaro. However, we disagree.

"The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court." *Lusk v. State*, 446 So. 2d 1038, 1041 (Fla. 1984). "A trial court has great discretion when deciding whether to grant or deny a challenge for cause based on juror competency." *Conde v. State*, 860 So. 2d 930, 939 (Fla. 2003). "This is because trial courts have a unique vantage point in their observation of jurors' voir dire responses." *Id.* As a result, "this Court gives deference to a trial court's determination of a prospective juror's qualifications and will not overturn that determination absent manifest error." *Id.*

Here, the trial court did not abuse its discretion. Although Mr. Vaccaro initially indicated that it may be true that he would be more likely to believe a police officer due to his familial relationships, upon further questioning he

affirmed that he could follow the judge's instruction to evaluate witness testimony individually and not give more weight to a witness's testimony because the witness is a police officer. The trial judge noted that in observing Mr. Vaccaro, he seemed very sincere and honest in his assertion. Appellate counsel was not ineffective for failing to raise this meritless issues. *See Mosley v. State*, 209 So. 3d 1248, 1271 (Fla. 2016).

Accordingly, we deny relief.

## 3. Representing Murray at Trial and on Direct Appeal

Murray next claims that appellate counsel was ineffective for serving as both trial counsel and counsel on direct appeal, violating Murray's rights to conflict-free counsel, due process, and equal protection. However, no relief is warranted.

"An actual conflict of interest that adversely affects counsel's performance violates the Sixth Amendment of the United States Constitution." *McWatters v. State*, 36 So. 3d 613, 635 (Fla. 2010). "To prove a claim that an actual conflict of interest existed between a defendant and his counsel, the defendant must show that his counsel actively represented conflicting interests and that the conflict adversely affected counsel's performance." *Thompson v. State*, 759 So. 2d 650, 661 (Fla. 2000) (quoting *Quince v. State*, 732 So. 2d 1059, 1063 (Fla. 1999)). "A possible, speculative or merely hypothetical conflict is 'insufficient to impugn a criminal

conviction.' " *Hunter v. State*, 817 So. 2d 786, 792 (Fla. 2002) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)).

However, because ineffective assistance of counsel claims for failing to preserve issues at trial are properly raised in postconviction, there arises no potential for conflict when counsel is the same for trial and direct appeal. Additionally, "[a]ppellate counsel's failure to raise an issue which was not preserved for appellate review and which does not present a fundamental error does not amount to a serious deficiency in performance." *Bertolotti v. Dugger*, 514 So. 2d 1095, 1097 (Fla. 1987). As a result, Murray cannot demonstrate the deficiency prong of *Strickland* regarding counsel's decision to represent Murray during trial and on direct appeal.

Accordingly, we deny this habeas claim.

## 4. John Wilson

Murray contends that appellate counsel was ineffective on direct appeal for failing to argue fundamental error and ineffective assistance of counsel on the face of the record regarding John Wilson's testimony reconciling the chain of custody of the hair on the victim's nightgown in relation to the lotion bottle. However, this habeas claim is procedurally barred.

To the extent Murray is utilizing this claim as an attempt to relitigate the admission of the hair evidence that was raised and rejected on direct appeal, it is

procedurally barred. *See Murray*, 3 So. 3d at 1115-16. Moreover, this claim is very similar to the claim of ineffective assistance of counsel raised in Murray's initial postconviction motion that was summarily denied by the postconviction court. Although claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus, *Valle*, 837 So. 2d at 907, claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion. *Rutherford v. Moore*, 774 So. 2d 637, 643 (Fla. 2000).

Accordingly, we deny this habeas claim.

## 5. DiZinno's Initials

Murray also claims that appellate counsel was ineffective for failing to more directly challenge Dizinno's testimony when he gave new testimony during the fourth trial that a lab assistant named Angie Moore probably placed his initials on the hair evidence slides at the lab based on a review of his notes. DiZinno had previously testified that he thought another technician had placed his initials on the slides, but he also testified previously that he was not certain about that. Because appellate counsel raised claims related to DiZinno's testimony and the chain of custody regarding this evidence, we conclude that he was not ineffective for failing to raise such claims.

A habeas petition should not be used as a vehicle for relitigating claims that were raised and rejected by this Court in prior proceedings. *See Thompson v. State*, 759 So. 2d 650, 657 n.6 (Fla. 2000). This Court has explained that when looking at claims of ineffective assistance of appellate counsel for failure to raise additional arguments in support of a claim on direct appeal, "petitioner's contention that [the point] was inadequately argued merely expresses dissatisfaction with the outcome of the argument in that it did not achieve a favorable result for petitioner." *Rutherford*, 774 So. 2d at 645 (quoting *Routly v. Wainwright*, 502 So. 2d 901, 903 (Fla. 1987)).

On appeal, appellate counsel raised multiple claims of evidence tampering, and the trial court's failure to exclude some evidence. *See Murray*, 3 So. 3d at 1115-16. This included a claim that the trial court erred by admitting the hair evidence despite indications of probable tampering. *See id.* Counsel specifically pointed to DiZinno's testimony and changing the name of the technician who worked for him that placed his initials on the slides. Initial Brief For Appellant at 23-26, 27-31, 47-49, *Murray*, 3 So. 3d 1108. Therefore, because he in fact did so, appellate counsel cannot be deemed ineffective for failing to challenge the chain of custody through the change in DiZinno's testimony regarding who placed his initials on the slides.

**6. Prosecutorial Misconduct**

Finally, Murray alleges that appellate counsel was ineffective for failing to raise a claim of prosecutorial misconduct based on inconsistencies in testimony of various witnesses on direct appeal. However, we deny relief.

Appellate counsel cannot be deemed ineffective for failing to raise a meritless issue. *See Valle*, 837 So. 2d at 908. Murray has not cited one case involving prosecutorial misconduct based upon inconsistent testimony of witnesses on retrial. *Cf. Ruiz v. State*, 743 So. 2d 1, 8-9 (Fla. 1999) ("Prosecutors Cox and Goudie attempted to tilt the playing field and obtain a conviction and death sentence in a number of improper ways: by invoking the immense power, prestige, and resources of the State (i.e., 'What interest do we [prosecutors] as representatives of the citizens of this county have in convicting somebody other than the person—.'); by demeaning and ridiculing the defendant (i.e., 'if that guy were Pinocchio, his nose would be so big none of us would be able to fit in this courtroom'); by characterizing the defendant as the archetypical liar and then equating truth with justice and justice with a conviction (i.e., '[t]ruth equals justice' and 'justice is that you convict him'); by appealing to the jurors' raw emotions (i.e., recounting the anecdote concerning prosecutor Cox's cancer-stricken father); and by introducing improper evidence (i.e., the blown-up photo of the bloody head; testimony concerning the unrelated robbery charge; and testimony concerning the unrelated gun)."). Appellate counsel was not deficient for using the alleged

inconsistencies in testimony as support for evidence tampering claims that were successful in previous direct appeals rather than as support for a novel prosecutorial misconduct claim.[14]

Accordingly, we deny habeas relief.

## III. CONCLUSION

For the reasons set forth above, we affirm the postconviction court's order granting *Hurst* relief but denying Murray's other initial postconviction motion claims. We also affirm the summary denial of Murray's successive postconviction motion and deny his habeas petition.

It is so ordered.

PARIENTE, LEWIS, QUINCE, and LABARGA, JJ., concur.
PARIENTE, J., concurs with an opinion.
LAWSON, J., concurs specially with an opinion.
POLSTON, J., concurs in part and dissents in part with an opinion, in which
CANADY, C.J., concurs.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED
ON OR BEFORE DECEMBER 27, 2018.  A RESPONSE TO THE MOTION
FOR REHEARING/CLARIFICATION MAY BE FILED ON OR BEFORE
JANUARY 2, 2019.  NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO
FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED,
DETERMINED.

---

14. Murray also raised a *Giglio* claim in his initial postconviction motion, which the postconviction court denied, based upon the inconsistent testimony resolving the chain of custody discrepancies.

PARIENTE, J., concurring.

I agree with the majority's decision affirming the postconviction court's order granting Murray a new penalty phase pursuant to *Hurst*[15] and denying Murray's separate petition for a writ of habeas corpus. I write separately to, again, emphasize the arbitrariness in the discrepancy between Murray, who is receiving *Hurst* relief, and his accomplice, Taylor, who was denied *Hurst* relief. *See Taylor v. State*, No. SC18-520, slip op. at 26-28 (Fla. Dec. 20, 2018) (Pariente, J., concurring in result).

Taylor and Murray were both convicted of first-degree murder and sentenced to death for the same crime—the 1990 murder of Alice Vest. *Id.* at 28. Taylor's conviction and sentence of death became final in 1994. *Id.* at 26. However, as I explained in my concurring in result opinion in *Taylor*, Murray's conviction and sentence did not become final until 2009 because he received three retrials. *Id.* at 27. Therefore, "[e]ven though both defendants received nonunanimous recommendations for death—Taylor received a 10-2 jury recommendation for death and Murray received an 11-1 jury recommendation—Murray will receive a new penalty phase . . . but Taylor will not." *Id.* This discrepancy between Taylor and Murray's cases illustrates how "the Court's line-

_____

15. *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017); *see Hurst v. Florida*, 136 S. Ct. 616 (2016).

- 35 -

drawing for the retroactivity of *Hurst* creates unconstitutional results for defendants." *Id.* at 28.

LAWSON, J., concurring specially.

I concur in that portion of the opinion affirming the postconviction court's order granting *Hurst* relief for the reasons explained in *Okafor v. State*, 225 So. 3d 768, 775-76 (Fla. 2017) (Lawson, J., concurring specially), and I fully concur as to all other issues addressed in the majority opinion.

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its affirming the grant of a new penalty phase pursuant to *Hurst*.

CANADY, C.J., concurs.

Appeals from the Circuit Court in and for Duval County,
        Russell L. Healey, Judge - Case No. 161992CF003708AXXXMA
And an Original Proceeding – Habeas Corpus

Pamela Jo Bondi, Attorney General, and Jennifer A. Donahue, Assistant Attorney General, Tallahassee, Florida,

        for Appellant/Cross-Appellee/Respondent

Rick A. Sichta, Susanne K. Sichta, and Joe Hamrick of The Sichta Firm, LLC, Jacksonville, Florida,

        for Appellee/Cross-Appellant/Petitioner